ADDISON et al. *v.* HOLLY HILL FRUIT PRODUCTS, INC.

No. 217. Argued January 10, 1944.—Decided June 5, 1944.

608

*Messrs. George Palmer Garrett* and *Ellis F. Davis* for petitioners.

*Mr. G. L. Reeves*, with whom *Messrs. R. B. Huffaker* and *C. O. Andrews, Jr.* were on the brief, for respondent.

By special leave of Court, *Mr. Douglas B. Maggs*, with whom *Solicitor General Fahy, Messrs. Archibald Cox* and *James H. Shelton*, and *Miss Bessie Margolin* were on the brief, for the Administrator of the Wage and Hour Division, Department of Labor, as *amicus curiae*, urging reversal.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This is a suit brought by employees of Holly Hill Fruit Products, Inc. for wage payments under the Fair Labor Standards Act. 52 Stat. 1060, 29 U. S. C. §§ 201 *et seq.* A judgment for the employees, the petitioners here, was reversed by the Circuit Court of Appeals, which held that Holly Hill's employees were by virtue of § 13 (a) (10) of the Act exempted from its scope, in that they were "within the area of production (as defined by the Administrator), engaged in . . . canning of agricultural . . . commodities for market . . ." The court below reached this con-

clusion by holding that a portion of the definition of "area of production" made by the Administrator of the Wage and Hour Division was invalid and that the remaining portion afforded exemption. 136 F. 2d 323. We brought the case here, 320 U. S. 725, to settle a much litigated question of importance in the administration of the Fair Labor Standards Act.

Holly Hill, a citrus fruit cannery employing some two hundred workers, is located in Davenport, Florida, a town with a population of about 650 people. During the two seasons in controversy—November 14, 1938 to May 26, 1939, and November 16, 1939 to March 30, 1940—the Administrator promulgated three regulations based on the scope he gave to his authority under § 13 (a) (10) to define "area of production." The validity of aspects of these regulations is the crucial issue.

By regulation of October 20, 1938, the Administrator defined "area of production" as used in § 13 (a) (10) to include an individual engaged in canning "if the agricultural or horticultural commodities are obtained by the establishment where he is employed from farms in the immediate locality and the number of employees in such establishment does not exceed seven." 29 Code Fed. Reg. (Supp. 1938) § 536.2 (b). Effective April 20, 1939, an alternative definition, applicable to perishable or seasonal fresh fruits and vegetables, brought workers into the "area of production" if employed "in an establishment which is located in the open country or in a rural community and which obtains all of its products from farms in its immediate locality." It was provided that " 'open country' or 'rural community' shall not include any city or town of 2,500 or greater population according to the 15th United States Census, 1930, and 'immediate locality' shall not include any distance of more than ten miles." 29 Code Fed. Reg. (Supp. 1939) § 536.2 (e), pp. 2239–40. Finally, this alternative definition, no longer limited to

fruits and vegetables, was in substance incorporated into the regulations effective June 17, 1939, but in addition it was provided that an individual might also be within the "area of production" "if he performs those [canning] operations on materials all of which come from farms in the general vicinity of the establishment where he is employed and the number of employees engaged in those operations in that establishment does not exceed seven." 29 Code Fed. Reg. (Supp. 1939) § 536.2 (a) (d), p. 2240.

Before coming to the main question, that of the validity of adding a limitation on the allowable number of employees in one canning establishment within the exempted geographic bounds, we shall dispose of the applicability of the Administrator's other exempting definitions to Holly Hill's employees.

The definitions which contain no employee limitation impose two essential conditions on an exemption sought under § 13 (a) (10): the establishment must be located in a city or town having a population smaller than 2,500,[1] and all of its products must be obtained from within ten miles of the establishment. Since Davenport contains less than 2,500 persons, the first condition is met and we need not pass on its validity.[2] As to the second condition, the only evidence introduced indicates that during the 1938–1939 season, about 2% of the fruit used came from beyond ten air miles of the plant, and that for the 1939–1940 season, about 3.75% came from groves more than ten air miles from Holly Hill. Since all of the fruit did not come from within ten miles, Holly Hill did not

---

[1] The fact that Davenport is within four miles of Haines City, with a population greater than 2,500, led the district court to conclude that Holly Hill was not located in the "open country" or a "rural community." This appears to be a plain solecism. 29 Code Fed. Reg. (Supp. 1939) § 536.2 (e), pp. 2239–40, and § 536.2 (d), p. 2240.

[2] It is conceded that a specific ruling on the population criterion is unnecessary.

satisfy this condition of the Administrator's definitions. There can be no doubt that this conclusion is justified by a literal reading of the regulations, and the court below, in holding that the Administrator's requirement that all the goods come from within ten miles must be construed to mean "substantially all," entered the Administrator's domain. What was said in another connection is relevant here. "Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the [Administrator] must be accepted unless we can say that it is very wide of any reasonable mark." Mr. Justice Holmes, dissenting, in *Louisville Gas Co.* v. *Coleman,* 277 U. S. 32, 41.[3]

We come then to the validity of the October 20, 1938, regulation and that of the alternative in the June 17, 1939, regulation which provide in substance that an individual is employed within the "area of production" if an establishment obtains the commodities from the "immediate locality" (1938) or all the materials come from the "general vicinity" (1939), and in addition the number of employees in the establishment "does not exceed seven." In short, when Congress exempted "any individual employed within the area of production (as defined by the Administrator)" (§ 13 (a) (10)), did it authorize the Administrator not only to designate territorial bounds for the purposes of exemption but also to except establishments from such exemption according to the number of workers employed.

---

[3] Holly Hill here attacked the finding of the district court that all of the fruit did not come from within ten miles, but we see no reason to disturb it.

612

Congress provided for eleven exemptions from the controlling provisions relating to minimum wages or maximum hours of the Fair Labor Standards Act.[4] Employment in agriculture is probably the most far-reaching exemption. Closely related to it is the exemption which is our immediate concern—those workers engaged in processes necessary for the marketing of agricultural products and employed "within the area of production" of

[4] "SEC. 13 (a) The provisions of sections 6 and 7 shall not apply with respect to (1) any employee employed in a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman (as such terms are defined and delimited by regulations of the Administrator); or (2) any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce; or (3) any employee employed as a seaman; or (4) any employee of a carrier by air subject to the provisions of title II of the Railway Labor Act; or (5) any employee employed in the catching, taking, harvesting, cultivating, or farming of any kind of fish, shellfish, crustacea, sponges, seaweeds, or other aquatic forms of animal and vegetable life, including the going to and returning from work and including employment in the loading, unloading, or packing of such products for shipment or in propagating, processing, marketing, freezing, canning, curing, storing, or distributing the above products or byproducts thereof; or (6) any employee employed in agriculture; or (7) any employee to the extent that such employee is exempted by regulations or orders of the Administrator issued under section 14; or (8) any employee employed in connection with the publication of any weekly or semiweekly newspaper with a circulation of less than three thousand the major part of which circulation is within the county where printed and published; or (9) any employee of a street, suburban, or interurban electric railway, or local trolley or motor bus carrier, not included in other exemptions contained in this section; or (10) to any individual employed within the area of production (as defined by the Administrator), engaged in handling, packing, storing, ginning, compressing, pasteurizing, drying, preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market, or in making cheese or butter or other dairy products; or (11) any switchboard operator employed in a public telephone exchange which has less than five hundred stations." 52 Stat. 1067, as amended, 53 Stat. 1266.

such commodities. Such was the phrase and such its conjunction with the exemption for agriculture of which it formed an integral part as the bill passed both Houses, except that the enumerated exempted employments subsidiary to agriculture varied in the two bills.[5] The parenthetical qualification "(as defined by the Administrator)" emerged from the conference committee of the two Houses.[6]

The textual meaning of "area of production" is thus reinforced by its context: "area" calls for delimitation of

---

[5] The exemptions provided in § 13 (a) (10) did not appear in the bill as reported to the Senate, but in the debate on the floor of that body an effort was made to extend the exemption accorded to agricultural workers, and as passed by the Senate the bill provided that "The term 'person employed in agriculture', as used in this act, insofar as it shall refer to fresh fruits and vegetables, shall include persons employed within the area of production engaged in preparing, packing, or storing such fresh fruits or vegetables in their raw or natural state." 81 Cong. Rec. 7876, 7949, 7957. This provision, varied somewhat by extending its coverage to all "agricultural commodities" (82 Cong. Rec. 1783–1784), remained as part of the definition of "Employee employed in agriculture" (H. Rep. No. 2182, 75th Cong., 3d Sess., p. 2) until shortly before the bill was finally adopted by the House, at which time the so-called Biermann amendment included within the definition of employees engaged in agriculture "individuals employed within the area of production, engaged in the handling, packing, storing, ginning, compressing, pasteurizing, drying, or canning of farm products and in making cheese and butter." 83 Cong. Rec. 7401, 7407. At the conference on the disagreeing votes of the two Houses, the "area of production" provision was given the form in which it was finally enacted, and there the parenthetical phrase "as defined by the Administrator" was inserted after "area of production." 83 Cong. Rec. 9249.

[6] Compare this provision with § 13 (a) (1) exempting employees in "a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman (as such terms are defined and delimited by regulations of the Administrator)." For this class, the Administrator is given the authority to define and delimit the "terms" used. But in the same section, subdivision 10 grants authority to define not the term "area," but to define the "area."

territory in relation to the complicated economic factors that operate between agricultural labor conditions and the labor market of enterprises concerned with agricultural commodities and more or less near their production. The phrase is the most apt designation of a zone within which economic influences may be deemed to operate and outside of which they lose their force. In view, however, of the variety of agricultural conditions and industries throughout the country, the bounds of these areas could not be defined by Congress itself. Neither was it deemed wise to leave such economic determination to the contingencies and inevitable diversities of litigation. And so Congress left the boundary-making to the experienced and informed judgment of the Administrator. Thereby Congress gave the Administrator appropriate discretion to assess all the factors relevant to the subject matter, that is, the fixing of minimum wages and maximum hours.

In delimiting the area the Administrator may properly weigh and synthesize all such factors. So long as he does that and no more, judgment belongs to him and not to the courts. For Congress has cast upon him the authority and the duty to define the "area of production" of agricultural commodities with reference to which exemption in subsidiary employments may operate. But if Congress intended to allow the Administrator to discriminate between smaller and bigger establishments within the zone of agricultural production, Congress wholly failed to express its purpose. Where Congress wanted to make exemption depend on size, as it did in two or three instances not here relevant, it did so by appropriate language.[7] Congress referred to quantity when it desired to legislate on the basis of quantity.

---

[7] See §§ 13 (a) (2) (8) (11) dealing respectively with retail or service establishments, weekly or semi-weekly newspapers and public telephone exchanges.

Congressional purpose as manifested by text and context is not rendered doubtful by legislative history. Meagre as that is, it confirms what Congress has formally said.  The only extrinsic light cast on Congressional purpose regarding "area of production" is that cast by the sponsors of this provision for enlarging the range of agricultural exemptions.  Senator Schwellenbach frankly stated that the largest apple packing plant in the world would be exempt if the "work done in that plant is as described in the amendment."  81 Cong. Rec. 7877.  And in the House, Representative Biermann, while explaining his amendment in somewhat Delphic terms, did indicate plainly enough that he had in mind not differences between establishments within the same territory but between rural communities and urban centers: "may I say that all over this country it has been recognized that there should be a labor differential between the large city and the little town."  83 Cong. Rec. 7401.[8]

From such light as Congress gave us beyond its words, it would appear that in giving exemption to an "area of production," without differentiating as between establishments within such area, Congress might well have considered that a large plant within an area should not be given an advantage over small plants in competing for labor within the same locality, while at the same time it

---

[8] Representative Biermann was asked whether his amendment "would apply to a packing house located in Iowa and Illinois in the area of production, which employs two or three hundred men."  This was his complete answer: "Speaking frankly, I think that is something that would have to be worked out.  There are some packing houses in the State of Iowa that this amendment would apply to perhaps; but may I say that all over this country it has been recognized that there should be a labor differential between the large city and the little town."  Certainly Mr. Biermann did not give the remotest intimation that "area of production" was meant to convey any idea other than that which area usually conveys.

gave the Administrator ample power, in defining the area, to take due account of the appropriate economic factors in drawing the geographic lines. In any event, Congress did not leave it to the Administrator to decide whether within geographic bounds defined by him the Act further permits discrimination between establishment and establishment based upon the number of employees. The determination of the extent of authority given to a delegated agency by Congress is not left for the decision of him in whom authority is vested.

The wider a delegation is made by Congress to an administrative agency the more incomplete is a statute and the ampler the scope for filling in, as it is called, its details. But when Congress wants to give wide discretion it uses broad language. Thus, in the Interstate Commerce Act, Congress prohibited a lower rate for a longer than a shorter haul, but it gave an authority to the Interstate Commerce Commission, undefined except as the general purposes of that Act implied the basis for affording exemption, to grant relief from this prohibition. *Intermountain Rate Cases*, 234 U. S. 476. Again in the National Labor Relations Act, Congress gave the Board authority to take such action "as will effectuate the policies of this Act." § 10 (c), 49 Stat. 449, 454, 29 U. S. C. § 160 (c). The "policies" of the Act were so broadly defined by Congress that the determination of "the relation of remedy to policy is peculiarly a matter for administrative competence." *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 194. In the Fair Labor Standards Act, Congress legislated very differently in relation to the problem before us. To be sure, the Fair Labor Standards Act, like the National Labor Relations Act, was based on findings and a declaration of broad policy. But Congress did not prescribe or proscribe generally and then . give broad discretion for administrative relief as in the Interstate Commerce Act or for remedies as in the

National Labor Relations Act. Congress did otherwise. It dealt with exemptions in detail and with particularity, enumerating not less than eleven exempted classes based on different industries, on different occupations within the same industry (the classification in some instances to be defined by the Administrator, in some made by Congress itself, in others subject to definition by other legislation), on size and on areas. In short the Administrator was not left at large. A new national policy was here formulated with exceptions, catalogued with particularity and not left within the broad dispensing power of the Administrator. Exemptions made in such detail preclude their enlargement by implication.

We should of course be faithful to the meaning of a statute. But after all Congress expresses its meaning by words. If legislative policy is couched in vague language, easily susceptible of one meaning as well as another in the common speech of men, we should not stifle a policy by a pedantic or grudging process of construction. To let general words draw nourishment from their purpose is one thing. To draw on some unexpressed spirit outside the bounds of the normal meaning of words is quite another. For we are here not dealing with the broad terms of the Constitution "as a continuing instrument of government" but with part of a legislative code "subject to continuous revision with the changing course of events." *United States* v. *Classic,* 313 U. S. 299, 316.

Legislation introducing a new system is at best empirical, and not infrequently administration reveals gaps or inadequacies of one sort or another that may call for amendatory legislation. But it is no warrant for extending a statute that experience may disclose that it should have been made more comprehensive. "The natural meaning of words cannot be displaced by reference to difficulties in administration." *Commonwealth* v. *Grunseit* (1943) 67 C. L. R. 58, 80. For the ultimate question

is what has Congress commanded, when it has given no clue to its intentions except familiar English words and no hint by the draftsmen of the words that they meant to use them in any but an ordinary sense. The idea which is now sought to be read into the grant by Congress to the Administrator to define "the area of production" beyond the plain geographic implications of that phrase is not so complicated nor is English speech so poor that words were not easily available to express the idea or at least to suggest it. After all, legislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him.

The details with which the exemptions in this Act have been made preclude their enlargement by implication. While the judicial function in construing legislation is not a mechanical process from which judgment is excluded, it is nevertheless very different from the legislative function. Construction is not legislation and must avoid "that retrospective expansion of meaning which properly deserves the stigma of judicial legislation." *Kirschbaum Co.* v. *Walling,* 316 U. S. 517, 522. To blur the distinctive functions of the legislative and judicial processes is not conducive to responsible legislation.

We agree therefore with the Circuit Court of Appeals in holding invalid the limitations as to the number of employees within a defined area. But we cannot follow that Court in deleting this part of the administrative regulation and, by applying what remains of the definition, exempting Holly Hill's employees from the requirements of the Act. Since the provision as to the number of employees was not authorized, the entire definition of which that limitation was a part must fall. We can hardly assume that the Administrator would have defined "area of production" merely by deleting the employee pro-

vision, had he known of its invalidity. It would be the sheerest guesswork to believe that elimination of an important factor in the Administrator's equation would have left his equation unaffected even if he did not here insist upon its importance. It is not for us to write a definition. That is the Administrator's duty.

Concluding, then, that when Congress granted exemptions for workers within the "area of production (as defined by the Administrator)" it restricted the Administrator to the drawing of geographic lines, even though he may take into account all relevant economic factors in the choice of areas open to him, the regulations which made discriminations within the area defined by applying the exemption only to plants with less than seven employees are *ultra vires*. But that leaves the difficult problem of the proper disposition of the case. It is our view that the case should be remanded to the district court with instructions to hold it until the Administrator, by making a valid determination of the area with all deliberate speed, acts within the authority given him by Congress.

Such a disposition is most consonant with justice to all interests in retracing the erroneous course that has been taken. Neither law nor logic dictates an "either-or" conclusion—that is, a conclusion that the employment in these industries is entirely exempt because the Administrator misconceived the bounds of his regulatory powers although plainly enough he meant to exercise them so as not to withdraw all these employments from the requirements of the Act, or that employment in these industries is subject to the Act because no exception excludes it. The two opposing alternatives do violence to the law as Congress wrote it. To hold that all individuals "engaged in handling, packing, storing, ginning, compressing, pasteurizing, drying, preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market, or in making cheese or butter or other dairy

products" are exempt from the operation of the Act is obviously to fly in the face of Congressional purpose. The Act exempts some but not all of the employees engaged in these industries, and it is not for us now to say that all are exempt. So to hold would postpone the operation of the Act in the enumerated instances for at least six years beyond the date fixed by Congress. Equally offending to the purposes of Congress and therefore to fairness in this situation is the suggestion that if the exemption falls all employees engaged in the designated industries are covered by the Act.

The accommodation that we are making assumes, what we must assume, that the Administrator will retrospectively act as conscientiously within the bounds of the power given him by Congress as he would have done initially had he limited himself to his authority. To be sure this will be a retrospective judgment, and law should avoid retroactivity as much as possible. But other possible dispositions likewise involve retroactivity, with the added mischief of producing a result contrary to the statutory design.

Such an adaptation of court procedure to a remolding of the situation as nearly as may be to what it should have been initially is not unprecedented. Such was essentially the procedure which was devised to unravel the skein in *United States* v. *Morgan,* 307 U. S. 183. The Court did not feel itself balked by the kind of considerations that seemed controlling to a Baron Parke. The creative analogies of the law were drawn upon by which great equity judges, exercising imaginative resourcefulness, have always escaped the imprisonment of reason and fairness within mechanical concepts of the common law. See, *e. g., Atlantic Coast Line* v. *Florida,* 295 U. S. 301; *Inland Steel Co.* v. *United States,* 306 U. S. 153; and for some examples of this approach see *Graf* v. *Hope Building Corp.,* 254 N. Y. 1, 7 (Cardozo, Ch. J., dissenting). That

such were the large considerations that guided decision in the *Morgan* case the opinion makes clear:

". . . in construing a statute setting up an administrative agency and providing for judicial review of its action, court and agency are not to be regarded as wholly independent and unrelated instrumentalities of justice, each acting in the performance of its prescribed statutory duty without regard to the appropriate function of the other in securing the plainly indicated objects of the statute. Court and agency are the means adopted to attain the prescribed end, and so far as their duties are defined by the words of the statute, those words should be construed so as to attain that end through coordinated action. Neither body should repeat in this day the mistake made by the courts of law when equity was struggling for recognition as an ameliorating system of justice; neither can rightly be regarded by the other as an alien intruder, to be tolerated if must be, but never to be encouraged or aided by the other in the attainment of the common aim." 307 U. S. at 191.

If it be said that in the *Morgan* case the Court was dealing with a fund in court—irrelevant though that be to the governing principles of that decision—no such constriction can be made of the import of our decision in *General American Tank Car Corp. v. Terminal Co.*, 308 U. S. 422. That, like this, was an action at law and not a suit in equity involving a *res*. The respondent was seeking to recover a sum admittedly due under a car-leasing agreement with petitioner. The Interstate Commerce Commission urged that since the Commission had not, as the law required, passed upon the validity of the practice involved in the agreement, the district court was without jurisdiction. And so, technically speaking, the district court was. But this Court remanded the case to the district court with instructions to hold the cause "pending the conclusion of an appropriate administra-

tive proceeding." The petition for rehearing claimed that our decision involved retroactivity. 309 U. S. 694. So it did. But as against retroactivity we balanced the considerations that made retroactivity seem the lesser evil.

In short, the judicial process is not without the resources of flexibility in shaping its remedies, though courts from time to time fail to avail themselves of them. The interplay between law and equity in the evolution of more just results than the hardened common law afforded, has properly been drawn upon in working out accommodating relationships between the judiciary and administrative agencies. And certainly in specific cases, such as those already referred to and in this, it is consonant with judicial administration and fairness not to be balked by the undesirability of retroactive action any more than courts have found it difficult to sanction legislative ratification of acts originally unlawful, *United States* v. *Heinszen & Co.,* 206 U. S. 370; *Tiaco* v. *Forbes,* 228 U. S. 549; *Graham & Foster* v. *Goodcell,* 282 U. S. 409; *Hirabayashi* v. *United States,* 320 U. S. 81, 91, or retroactively to give prior legislation new scope. *Paramino Lumber Co.* v. *Marshall,* 309 U. S. 370. And in *habeas corpus* proceedings, even though a petitioner was unlawfully in custody, this Court has allowed continued retention of custody until a valid order could be made. *Mahler* v. *Eby,* 264 U. S. 32; *Tod* v. *Waldman,* 266 U. S. 113.

Finally, there is no difficulty upon such a remand in requiring the Administrator to promulgate his definition. This Court has on several occasions required the Interstate Commerce Commission to take jurisdiction when it declined to do so or to discharge a duty laid upon the Commission by statute. *Interstate Commerce Commission* v. *Humboldt Steamship Co.,* 224 U. S. 474; *Louisville Cement Co.* v. *Interstate Commerce Commission,* 246 U. S. 638. See also *Kansas City Southern Ry. Co.* v. *Interstate Commerce Commission,* 252 U. S. 178. The district court

would not be telling the Administrator how to exercise his discretion but would merely require him to exercise it. It is a remedy against inaction.

Holly Hill also contended that if it is not entirely exempt from paying the overtime rates here awarded, it is entitled to the advantage of the partial seasonal exemptions afforded by §§ 7 (b) (3) and 7 (c). The district court ruled adversely to Holly Hill on these claims, but the Circuit Court of Appeals did not reach them. It will be time enough to reach them if they survive the disposition now made of this case.

Accordingly, the case is remanded to the district court to proceed in conformity with this opinion.

*So ordered.*

MR. JUSTICE ROBERTS:

I agree with the opinion of this court and with the opinion of the Circuit Court of Appeals that the Administrator was without power (if "area of production" is to have any sensible meaning) to exclude from the area and from the operation of the exemption workers in a processing plant clearly within the area on the ground that a certain number of employes worked in the plant. If Congress, when it said that the area of production should be defined by the Administrator, meant that that official should have a roving commission to create exemptions from the Act, the entire provision must fall as an unconstitutional attempt to delegate legislative power. We should never, however, construe an Act in a sense which would render it unconstitutional if a different and permissible construction will save it.

The legislative history makes it clear enough that Congress wished to exempt plants processing agricultural commodities in the locality of the farms which produced the commodities. Realizing that the ascertainment of the facts in particular cases would be essential to definition or

delimitation of the area served, Congress, by the phrase "as defined by the Administrator," meant to permit him to draw lines in delimitation of areas appropriately to correspond to the facts. I construe the word "define," in this context, to mean "ascertain the facts and announce the result of such ascertainment." The opinions of the court below elaborate this view.

I think the Administrator's order may well be allowed to stand with the illegal and unauthorized feature of it deleted. This is what the Circuit Court of Appeals decided and I believe it was right. Other features of the order were not, and are not, attacked and if, for the future, the Administrator desires, in other aspects, to amend his order, there is nothing to prevent. This would lead to affirmance of the judgment of the Circuit Court of Appeals and, if I could make my vote effective to that end, I should vote for affirmance. The other members of the court, however, are for reversal, but are divided on the question whether the judgment of the District Court should be affirmed or the case held in that court pending amendment of the order by the Administrator. Entertaining the views which I do, I cannot vote to affirm the judgment of the District Court, but that will be the effect of my action if I vote simply to reverse the judgment of the Circuit Court of Appeals. While I think none of the authorities cited in the opinion of MR. JUSTICE FRANKFURTER justify the procedure there outlined, I am constrained to vote in accordance with his opinion.

I am clear that, if the Administrator is to be permitted to amend his order, or to enter a new order effective from the date of the one under attack, he may not resort to gerrymandering or to any other device to accomplish by indirection what the decision holds he cannot do directly. I personally believe the scope of his discretion is more limited than some of my colleagues think and I do not wish my concurrence in the remand of the case to the

District Court, to be there held pending the promulgation of an amended order, or a new order, to be taken as approving in advance the views expressed as to the extent of the Administrator's discretion.

MR. JUSTICE RUTLEDGE, with whom MR. JUSTICE BLACK and MR. JUSTICE MURPHY concur, dissenting:

In my opinion the Administrator has defined "area of production" in a valid manner, and therefore the employee petitioners should prevail. But if, as the majority hold, his definition is not valid, then the exemption is not operative, and for that reason the petitioners likewise should prevail. I dissent, therefore, from the Court's conclusion that the definition is void. I dissent equally from the wholly novel disposition it makes of the cause on that hypothesis, in remanding it to await the Administrator's retroactive redetermination of the parties' rights.

## I.

The basic issue, as the case was presented, is whether the Administrator can include in the definition not only spacial limits but also a limit upon the number of employees in exempted establishments. The Administrator included this factor in his first definition; [1] later reexamined it in extensive hearings; [2] concluded on the record thus made that no purely geographical definition could be conformed to the major legislative policies announced in the statute; [3] has retained it in each of several later

---

[1] Promulgated October 20, 1938, effective four days later. 3 Fed. Reg. 2536.

[2] See Hearings on Proposed Amendment of Section 536.2 (area of production) of Regulations issued under the Fair Labor Standards Act of 1938, Wage and Hour Division, Department of Labor Ref. Nos. 54; 73; 162a; 162b; 162c.

[3] Tests proposed and considered included: the mapping of producing territories; a flat mileage-population definition; a "first concentration point" criterion; a standard which would include only estab-

definitions, varying in other details, framed after extensive hearing; [4] and now earnestly insists it, or an equivalent limitation on size of the plant, must be included, unless any definition he may make is to work havoc with some major policy of the Act, either by exempting large numbers of industrial employees [5] or by creating disturbances of competitive situations, both for farmers and for canners and packers,[6] which the statute expressly sought to avoid.

The Administrator's task is highly complex. It involves defining exemptions for employees throughout the nation engaged in "handling, packing, storing, ginning, compressing, pasteurizing, drying, preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market, or in making cheese or butter or other dairy products." § 13 (a) (10). All these operations follow immediately upon harvest and removal from the field or milking. All can be done on the farm and frequently are done there, but may be done elsewhere, often in factories. All consist in the first stages of preparation for market.

---

lishments which handled and prepared for the account of the farmer commodities to which he retained title. All these and others. were rejected by successive administrators, after being urged and opposed by industry representatives, as presenting insuperable obstacles to carrying out the statute's major policies.

[4] Compare the definition promulgated October 20, 1938, 3 Fed. Reg. 2536, with the amendments of April 20, 1939, 4 Fed. Reg. 1655; June 17, 1939, 4 Fed. Reg. 2436; October 1, 1940, 5 Fed. Reg. 2647; and April 1, 1941, 6 Fed. Reg. 1476.

[5] Cf. Department of Labor Release R.–226, March 18, 1939; G.–60, July 24, 1940.

[6] A flat mileage definition was in force during part of the time material in this case, but was abandoned after its effects, by way of creating serious unfair discrimination between competing establishments and narrowing grocers' outlets, became evident. Cf. Department of Labor Release G.–60, July 24, 1940.

But whether the specified operations will be done on the farm, as part of the farm work or away from it, and in either small neighborhood establishments or in larger industrial plants, will depend upon a variety of factors as great as that which comprehends the whole vast process of starting the nation's crops, over 300,[7] on their respective marketing courses. The initial steps in marketing such widely different products as cotton and apples; tobacco and milk; potatoes and citrus fruits; legume crops, wheat, corn and other grains, on the one hand, and tomatoes, strawberries, truck garden products, etc., on the other, are within the delegation.

The mere enumeration of these instances indicates some of the variables involved. Others add to the difficulty. Highly perishable crops, as fruits and vegetables, require immediate action in these stages of handling. Cotton, grains, root crops, etc., less perishable, may wait longer on the farm, some for months, before these processes become necessary. Some crops are highly concentrated for production in a few regions, such as citrus fruits in Florida, Southern Texas, and Southern California, but are marketed on a nation-wide scale. Others have regional areas of production, like cotton in the South, celery in Michigan, tobacco in the border states and a few northern regions, yet depend on the national market. Still others have regions of greater or less concentration, but are grown all over the nation, like wheat and other grains, apples, potatoes, etc.

Obviously, "area of production," in the sense of where the commodity is produced for purposes of commercial marketing, will vary from the whole nation, in the case of the more common grains, fruit crops and root crops, down to a few highly concentrated regions or areas in

[7] Cf. Farm and Ranch Schedules, U. S. Census of Agriculture, 16th Census of the United States, 1940.

the case of others more dependent upon special climatic and soil combinations. And between the extremes of nation-wide and highly localized production are all ranges of sectional and regional production areas.[8]

Respondent regards the "area of production" as the whole region where a commodity is grown, and therefore says the Administrator has no more to do than locate the existing limits of these areas. By this criterion the South, perhaps including California, would be the unalterable "area of production" for cotton, the whole nation for eggs, wheat, corn, etc. This conception would nullify the delegation, making of the Administrator merely a surveyor in the wrong place. Congress clearly was not making him only a finder of fact, namely, of the geographical limits surrounding regions where 300 different commodi-

---

[8] As the legislative history shows, cf. text *infra* at notes 13–16, there was fairly general agreement that some part of the work specified in § 13 (a) (10) should be exempt, whether or not it was done on the farm. But beyond this, a great variety of opinion existed both as to how far the exemption should go and as to the economic basis for it. Among the latter were views that the exemption should be made because the farmer bore the cost of the work, cf. 81 Cong. Rec. 7656, 7877, 7880; or because many farmers in fact performed it on their farms and as part of their operations, cf. § 3 (f), 52 Stat. 1060; 81 Cong. Rec. 7657–7659; or because others who had to resort to independent contractors to have it done would be discriminated against unless the work were exempt; cf. 81 Cong. Rec. 7656, 7658–7660, 7876. Some legislators were concerned to have the exemption apply whether the work were done in large or small plants; others to limit it to small ones only; and still others to secure it completely for particular crops. Numerous amendments were tendered, but for the most part defeated. It was not until the Conference Committee's report was framed that the problem was solved by referring it to definition by the Administrator. But even proponents of the amendments which were adopted recognized that the problem was one which "the board . . . would have to decide," 81 Cong. Rec. 7878, "something that would have to be worked out," 83 Cong. Rec. 7401.

ties are produced. Such a view would exempt all employees engaged in the operations specified in § 13 (a) (10).

The same objections forbid regarding the "area of production" as the region from which the particular plant purchases its raw material. The only substantial difference would be to make the Administrator's fact-finding task a more impossible one. A definition would be required for every plant engaging in any of the specified operations for each of the more than 300 agricultural and horticultural commodities produced annually in the United States. Congress hardly could have intended to load upon the Administrator a task of these infinite proportions. Nor did it intend the employer to define its own exemption, or to make that exemption automatic. Congress intended the Administrator to define the area of production. It did not at the same time intend to overwhelm him with making myriads of particular and highly variable definitions for each operating unit, or to make him merely a runner of courses and distances, whether large or small. It rather intended him to make practical, workable and therefore generic and stable definitions.

It follows necessarily that the Administrator's power is discretionary and the important questions are to what extent and in what manner may his discretion work. Neither subdivision (a) (10) nor § 13 as a whole supplies these answers. The section itself does not supply all the standards necessary for definition of the term. At most it affords direction to exempt some but not other employees engaged in the specified activities and that those exempted must be within the "area of production." This necessarily includes some region where the commodity is produced. But since that region is an unknown quantity and so also is the question what employees within it are to be exempted, solutions must be found either in other

provisions of the statute or in the legislative history, unless the delegation is to fall for want of standards.

The statute itself furnishes clear guides for directing the Administrator. He is confined, as has been noted, by subsection (a) (10) to employees engaged in the specified initial operations of marketing. They must work within some producing region. Apart from the exemption they are within the Act's coverage, but close to the major line it draws between farm workers, who are excluded from, and industrial labor, which is within its coverage. Depending, not upon what they do, but upon where and how they do this work, they would fall on one side or the other of this line and within or without the incidence of the evils the Act sought to eradicate. These were "the existence, *in industries* . . . of *labor conditions* detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers. . . ." [9] Congress exercised its authority over commerce, "to correct and as rapidly as practicable to eliminate the conditions above referred to *in such industries* without substantially curtailing employment or earning power." § 2 (a), (b). (Emphasis added.)

The broad line between farming and industry runs throughout the Act.[10] It is the statute's basic line of

---

[9] Section 2 (a). These conditions Congress found burden commerce, lead to labor disputes obstructing it, interfere with fair and orderly marketing, and spread themselves by causing the channels of commerce to be used for marketing among the several states the goods produced under them. *Ibid.*

[10] " 'Industry' means a trade, business, industry . . . in which individuals are *gainfully employed.*" § 3 (h). " 'Agriculture' includes farming in all its branches . . . and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market." § 3 (f). Section 5 provides for industry committees and their functioning, to which the

policy between coverage ,and noncoverage. The line not only is pertinent to each of the statute's provisions but, where the contrary is not clearly and unambiguously stated, it is controlling. There can be no assumption that Congress intended employees in one group to be transferred to or treated as being in the other where no such clear mandate can be found.

In determining what Congress intended by the delegation, it is crucial to keep in mind that, whatever decision the Administrator may make and by whatever criteria, the effect of his action must be to put some employees on one side of this line and others on the opposite side. That consequence he cannot escape. And, because he cannot avoid it, the line is pertinent and material to his choice, as it is to all others he must make in performing his duties. It is the statute's lodestar. The distinction between farming and industry is the essence of his determination. An "area of production" determined without reference to this distinction would contradict, not enforce, the statute's basic policy. And this appears, not solely from the policy itself and the effects of failure to take it into account, but from a consideration of other determinations the Act confides to the Administrator and of the manner in which it requires him to make them.

Thus, in issuing minimum wage orders and industry classifications, he and the industry committees must have "due regard to economic and competitive conditions," and act so as not to "substantially curtail employment" or "give a competitive advantage to any group." And there is a specific prohibition against fixing wages or classifications "solely on a regional basis." Rather the governing criteria are to be competitive conditions, wages for com-

Administrator submits data and from which he receives recommendations and reports which he must approve before making them effective in the form of minimum wage rates and industry classifications. Cf. § 8.

parable work fixed by collective bargaining or by voluntary minimum wage plans. § 8 (b), (c), (d). The statute's primary design was to bring industrial workers under its protections and to eliminate as rapidly as possible the substandard conditions of such labor. But this was to be done with an eye also to two other matters: one, that by too rapid advance employment be not curtailed; and, two, that competitive conditions in the affected industries be not unduly disturbed or competitive advantages created. Cf. § 2.

These purposes were inescapably pertinent to the problems of exemption arising under § 13 (a) (10). They were likewise pertinent to other exemptions, cf. § 7 (c) and compare § 7 (b), and to still other delegations the statute confided to the Administrator. That Congress did not burden the books with "an itemized catalogue" [11] of standards in each instance of delegation, gives no basis for believing that what permeated all else found these parts insulated. The Administrator clearly had power, and more, the duty, to take account of these factors.

If so, he could not escape the question of size. And indeed the Court does not deny this. Size certainly is not irrelevant to distinguish within any group which may do essentially the same work in two different ways, one the farming way, the other the industrial one. It is not irrelevant to economic dislocations or to curtailments of employment. And it is relevant to these things as much within as without an area of production.[12]

---

[11] *National Broadcasting Co.* v. *United States*, 319 U. S. 190, 219.

[12] Respondent, however, consistently with its "fact-finder" or "surveyor" theory of the Administrator's function, says the purpose was not to distinguish, within the specified activities, between farmers and industrial workers; it was rather to go a step further and exempt the latter as well, provided only they were within an area of production as respondent conceives it. That the Administrator may exempt some, or perhaps many, who are in fact industrial workers, because

The legislative history discloses one object of the exemption as originally proposed was to protect small farmers, who are unable to perform these operations at the farm and therefore are dependent upon whatever nearby establishments may exist, whether large or small. Various members of the Senate and of the House sponsored amendments for this purpose.[13]  As the bills went to conference each contained flat exemptions, substantially covering the activities now specified in § 13 (a) (10). But the debates in both houses show that even the sponsors of the various amendments differed or were doubtful concerning whether the amendments would give exemption to large plants.[14]  There was general agreement that

they are doing these activities under factory conditions and methods, may be conceded. That he must exempt all of them, or some larger number than his judgment, formed after considering the facts, the statute's policies, and the effects of what he may do, finds proper, cannot be accepted. Respondent claims an exemption fixed by the Act. The statute has given it one only when, in the Administrator's judgment, not arbitrarily formed, it meets the conditions which he finds will execute the legislative policy.

[13] The Senate's first suggestion of "area of production" came from Senator Copeland, 81 Cong. Rec. 7656, although Senator Schwellenbach became the chief proponent of the concept there. Senator Black, sponsor of the bill, was concerned with the scope of "area" and sought a more accurate term for limiting its effect so as not to exempt workers in large plants, cf. 81 Cong. Rec. 7656–7660, 7876–7878, and others expressed opinions that large operators should not be exempted. For portions of the discussion on the Senate floor see also 81 Cong. Rec. 7648–7673, 7876–7888, 7927–7929, 7947–7949.

In the House of Representatives, the sponsor of the bill was Representative Norton. Chief proponent of the amendment involving "area of production" was Representative Biermann. Cf. 83 Cong. Rec. 7325–7326, 7401–7408.

[14] Responding to inquiry whether packing houses in Iowa and Illinois would be exempted by his amendment, Representative Biermann said: "Speaking frankly, I think that is something that would have to be worked out." 83 Cong. Rec. 7401. Senator Schwellenbach clearly recognized his amendment would exempt large as well as small packing

small ones should be relieved from coverage.[15]  Senator
Reynolds went further and proposed several amendments
to relieve all small plants from the Act's provisions, not
merely those engaged in the limited operations specified
in the bills or § 13 (a) (10).  These were defeated.[16]  And
there was vigorous demand, from the sponsor of the bill in
the Senate and others,[17] for restricting the scope of the
amending exemptions to small plants.  These differences
were not settled on the floor of either house.  But when the
bills came to conference, they were resolved by changing
the flat exemptions into discretionary ones to be defined
by the Administrator.

Since the delegation feature did not appear until the
conference report and there is little in that report or in

and similar plants, 81 Cong. Rec. 7877, 7878, but expressed the opinion
there would not be "any large or enormous plants" in the specified
operations.  In response to Senator Black's inquiry concerning the
indefinite effect of "area" without further definition, he said: "I gave
considerable thought to that.  I do not believe it is possible, and that
is something which the board, which has been accused of receiving too
much power, would have to decide.  It would have to provide a defini-
tion of 'immediate production area.'"  Cf. 81 Cong. Rec. 7876–7878.

[15] See the discussions cited in notes 8, 13 and 14.

[16] Cf. 81 Cong. Rec. 7948.  Respondent argues from this that the in-
tent of Congress was shown not to authorize the Administrator, by
the later conference amendment, to distinguish among plants within
the "area of production" on the basis of size.  The argument, however,
ignores the fact that the amendments proposed by Senator Reynolds
were drawn and intended to exempt from the statute's operation *all*
plants having fewer than the number of employees (the amendments
varied from five to ten in this respect), not merely plants engaged in
the particular marginal operations specified in the various forms the
Schwellenbach Amendment took during the debate.  The conclusion to
be drawn from the rejection of the Reynolds Amendments is not that
the Senate intended to exempt all plants, large and small, covered by
the Schwellenbach Amendment or by the form taken by § 13 (a) (10)
in conference, but rather that the Senate was unwilling to except even
all plants having as few as five employees from the statute's coverage.

[17] Cf. notes 13 and 14, *supra*, and the cited discussions.

the debates upon it to add light, the previous discussions are wholly inconclusive, except in one respect. This was to show that there was great variety and complexity of opinion, and that this revolved around the question of size. That question continued unresolved up to conference and was resolved there, not by decision either way, but by reference to the Administrator. It must be taken therefore that the purpose was to give him discretion to make the necessary choices between the conflicting viewpoints as the facts of particular situations would give occasion for doing. And, it would seem, the preponderance of sentiment in favor of exempting small plants, but not large ones, except in occasional instances where this would be necessary to protect the small farmer, well could be taken as his guiding light. The legislative history, therefore, in so far as it sheds light at all, clearly is not inconsistent with what the Administrator has done, but on the contrary supports it.

The Court does not find the Administrator acted improperly by taking these considerations into account. He only must not state them in his definition. And this matter of mere formulation is the crux of the case. The definition must be made "in relation to the complicated economic factors that operate between *agricultural labor conditions* and *the labor market of enterprises* concerned with agricultural commodities and more or less near their production." (Emphasis added.) The Administrator is given "appropriate discretion to assess all the factors relevant to the subject matter," which is essentially one of "economic determination," too complex for litigation to solve. He "may properly weigh and synthesize all such factors."

In making his economic synthesis, however, the Administrator must state his results only in surveyor's terms. Congress, when it granted the exemption, "restricted the Administrator to the drawing of geographic

lines, even though he may take into account all relevant economic factors. . . ." The "zone within which economic influences may be deemed to operate and outside of which they lose their force" cannot be defined directly and purposively to draw the line between the zone of farming and the zone of industry. This must be done only indirectly, in an awkward, roundabout way.

Nothing prevents the Administrator from drawing the lines as he thinks best, unless the suggestion of the specially concurring opinion is followed that they must be drawn in regular circles or squares. The courts have no business to tell him where to put them. He can define distance by air lines or by road lines to market. He can run the lines around big towns, but not around big factories. Baltimore could be excluded, but not Martin's bomber plant or one like it, in size and methods, for processing or canning fruits and vegetables. Towns may go out, though surrounded by truck farms, but not commercial canneries. Residences, apparently, must surround the cannery. In short, the Administrator can draw whatever map lines he thinks will achieve the appropriate economic adjustments, except one which leaves out perhaps the biggest canning factory of all, and no court can interfere. I do not believe that Congress, when it gave the Administrator his complicated task and authorized him to consider all the relevant and complex economic factors, not only denied him the power to execute those considerations in his action, but compelled him to frustrate them in defining "area of production." The Court does not deny the Administrator may consider the size of the plant, and make this even the crucial factor in his decision. Yet it would only impede or defeat his judgment, formed on proper considerations, as well as the statute's purposes, to require him to state the exemption, not simply in the terms best chosen to express his meaning clearly and definitely, but in others couched in pure though tortured geography. According to his experience

and confirmed judgment, shared by successive administrators and never reversed or modified, to require the latter method of formulation would make his task well nigh impossible or, if not that, incapable of being discharged without doing violence to the Act's major purposes and standards.[18]

So much of authority and power to defeat the statute's intended operation cannot be given to mere verbalism, more especially to one word, torn in context, function and purpose from the remainder of the Act. "Area," it is true, means area. But "area of production" means more. "The notion that because the words of a statute are plain, its meaning is also plain, is merely pernicious oversimplification. It is a wooden English doctrine of rather recent vintage . . . to which lip service has on occasion been given here, but which since the days of Marshall this Court has rejected, especially in practice. . . . A statute, like other living organisms, derives significance and sustenance from its environment, from which it cannot be severed without being mutilated." [19] And so does a section in a statute. "Area of production" as used in § 13 (a) (10) means an exemption, limited to persons performing the specified operations within a producing region, but selected from all so situated by an exercise of the Administrator's judgment in accordance with the statute's prime objects and chief limitations, among which necessarily is the size of the plant. If that is so, I see no good reason for forbidding the Administrator to say so.

It follows the Administrator has not improperly exercised his function, the definitions are valid, and respondent's employees were not exempt from the statute's provisions.

[18] Cf. notes 1–6, *supra*, and text.

[19] *United States* v. *Monia*, 317 U. S. 424, dissenting opinion at 431–432.

## II.

But if the definitions were invalid, as the Court holds, I could not agree to the extremely novel disposition it makes of the case. We are dealing with an exemption, not with the statute's primary coverage. Concededly the respondent employer was liable to petitioners for the minimum wages, overtime pay and statutory penalties under § 16 (b), if they were not exempt under § 13 (a) (10) or some other exemption. Ordinarily exemptions are not favored. Coverage, not exemption, is preferred. If the exemption is dubious, it is not given effect. If ambiguous, it is resolved strictly in favor of the statute's application. *Spokane & Inland Empire R. Co.* v. *United States,* 241 U. S. 344; *Piedmont & Northern Ry. Co.* v. *Interstate Commerce Commission,* 286 U. S. 299, 311–312; *McDonald* v. *Thompson,* 305 U. S. 263. In this case, if the exemption does not apply, the petitioners are within the statute and respondent is liable on their claims.

To escape liability, respondent has the burden of showing the exemption does apply. But to do this it cannot merely show the definition of the Administrator is invalid. That would only leave itself and the petitioning employees subject to the Act's provisions, which require the payment of the claims. Respondent's dilemma therefore is both sharp and real. If the definition is valid, it does not cover these employees and respondent is liable to them. If the definition is invalid, clearly it exempts no one, petitioners are covered by the Act, and the respondent must pay. This is true whether the reason dictating invalidity is want of standards, application of the wrong ones, or merely formulating the result in the wrong way. This dilemma presents the alternative which respondent, the Court of Appeals and this Court have attempted to avoid in order, so it is said, to escape an "either-or" conclusion, which is the kind the law almost always must make. It is one from which there is no

escape without exercise of inventive genius beyond the right of either court to apply and which, as applied here, makes the cure worse than the disease.

Respondent's invention, and likewise the Court of Appeals', was to strike the limitation on the number of employees and apply the remainder of the definition. This but emasculates it. Hence all here, but one, are agreed such liberty cannot be taken with the Administrator's function. This Court's invention, however, does it equal or greater violence, first, as I think, in emasculating it; second, and lacking even more in justification, in requiring it to be exercised with backward-reaching effect.

If the Court had sought its escape in finding that there were no standards to control the Administrator's discretion or that he had applied the wrong standards, one might understand its refusal to sustain the definition. But that too would mean that petitioners would recover. The Court does neither. There is no claim, except a semblance of suggestion in a separate opinion, that the statute supplies no standards and therefore gives the Administrator "a roving commission to create exemptions." Nor is there one that the wrong standards were used. The invention is called forth only to correct a mode of statement.

If that were all, there would not be much room to complain. But, in addition to compelling the Administrator to make the definition in a manner which frustrates his function and the statute's objectives, or only partly fulfills them, the decision opens the door to a general expansion of the novel, and I think unauthorized, practice of retroactive administrative determination of private rights. That is true, unless these petitioners are to be specially treated, although less than a majority of the Court agree that the authorities cited to sustain it justify the procedure outlined. But if the procedure is justified in this case, it is in any other where an administrator

mistakenly includes in a regulation a factor later held to make it invalid. No reason stated makes this case a special one. And there is none. It cannot be taken that these parties are to be singled out for unique treatment, merely in order to avoid the normal legal consequences of invalidating administrative action. Hence, every interest affected by such action now must take two risks in place of one: first, the normal, inescapable risk that the governing regulation may be held invalid; second, in that event, the novel one that some future regulation, a wholly unknown quantity, will relate back over an indefinite time to create entirely new or different and unexpected rights and liabilities.

Of course there must be room for creative analogies in the law to give the desired escape from mechanical concepts and permit shaping its remedies. But we are as often told that Congress should perform the creative act in Congress' field. This should be most true where what we are called upon to recreate is Congress' own handiwork. If Congress intended the Administrator to act retroactively, Congress wholly failed to express this purpose.

Moreover, it is not remedies but rights which are thus refashioned. And not equity but law remolds them. Who knows, before the redefinition, what persons may be included in its coverage? Or whether it may not have to be made again? The same persons cannot be included. Otherwise there would be no point to this decision. If the Administrator can rephrase the same coverage in wholly geographic terms, apart from delay the only result will be to have criticized his language. If he cannot do this some persons, and no one can tell in advance how many, will be deprived altogether of rights, others given them who had none. So with liabilities.

The innovation would be serious if confined to this case or this Act. It is beyond prediction what the conse-

quences may be, of uncertainty, or hardship, of injustice in deprivation of rights, in windfalls of right to others, in laying on new and wholly unexpected liabilities and in relieving from anticipated ones, if retroactive administrative refashioning becomes the general practice. The alternative, either to sustain or to hold void the regulation, and fix the rights accordingly, is not only the accepted and established one. It is the only one by which men can know the risks they assume at the time they become subject to them.

Retroactivity is not favored in law. For this there are sound reasons, in some cases constitutional ones. Cf. *Forbes Pioneer Boat Line* v. *Board of Commissioners*, 258 U. S. 338; *Ochoa* v. *Hernandez y Morales*, 230 U. S. 139. There are few occasions when retroactivity does not work more unfairly than fairly. Congress, the state legislatures and the courts apply the principle sparingly, even where they may. Cf. *Graham & Foster* v. *Goodcell*, 282 U. S. 409; *United States* v. *Heinszen & Co.*, 206 U. S. 370. Seldom if ever therefore may administrative or executive authority to apply it be inferred from legislation not expressly giving it. Compare *Arizona Grocery Co.* v. *Atchison, T. & S. F. Ry. Co.*, 284 U. S. 370; *Helvering* v. *R. J. Reynolds Tobacco Co.*, 306 U. S. 110. But, in any event, whatever corrective needs may prompt and vindicate a grant of such authority in other circumstances are not present in this application. Yet, if this decision is to mark the beginning of a general pattern, such authority now bids fair to become a common characteristic of administrative action.

The administrative process has increasingly important functions in our legal system. Ordinarily it does enough if it takes care of today and tomorrow. When it begins to add yesterday, without clear congressional mandate, the burden may become too great. In any event, that has not heretofore generally been considered its task. If that task

is to be added, the addition should be made by the body whence administrative power is derived, not by this Court's imaginative resourcefulness.

Finally, respondent has not asked for this retroactive "relief." And this may be for entirely good reasons of its own. What respondent sought in the District Court, what it secured in the Court of Appeals, and what it has sought here, but clearly is not entitled to have, is a judicial declaration that, as a matter of law, its employees would have been exempt under any valid definition the Administrator might have adopted. In effect, this is a claim of exemption by the statute itself, one which would nullify the Administrator's power. Relief not sought should not be forced on respondent by an exercise of this Court's inventive genius. More especially should this not be done on the Court's own motion, without any of the parties having had an opportunity to consider or discuss it in the briefs or in argument. Under such a policy, generally followed, a litigant never can know with what kind of gift horse he may come out, even if successful. And in this case the parties have faced the double uncertainty, wholly unanticipated, of creation here and re-creation by the Administrator, when the latter undertakes relieving the District Court of the duty to await his further action.[20]

The judgment of the Court of Appeals should be reversed and the cause should be remanded to that court for determination of the other issues in the case.[21]

MR. JUSTICE DOUGLAS joins in that part of this dissent which would hold that the Administrator has defined "area of production" in a valid manner.

---

[20] The Administrator is not a party to this suit, but has appeared and participated here as *amicus curiae*.

[21] In view of its disposition of the case, the Court of Appeals did not consider respondent's defenses under §§ 7 (b) and 7 (c) of the Act, on both of which the District Court held for petitioners.