UNITED STATES of America, Plaintiff-Appellant,

v.

Marvin REDMOND, d/b/a Redmond's Jewelers, Defendant-Appellee.

No. 15183.

United States Court of Appeals Sixth Circuit.

Feb. 27, 1964.

Giora Ben-Horin, Dept. of Justice, Washington, D. C., for appellant, Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Attys., Dept. of Justice, Washington, D. C., Lawrence Gubow, U. S. Atty., Robert F. Ritzenhein, Asst. U. S. Atty., Detroit, Mich., on the brief.

John C. Siegesmund, Jr., Detroit, Mich., for appellee, Calvert Thomas, Detroit, Mich., on the brief.

Before CECIL and O'SULLIVAN, Circuit Judges, and FREEMAN, District Judge.

O'SULLIVAN, Circuit Judge.

Appellant, United States of America, plaintiff in the District Court, asks reversal of a judgment there entered for defendant in the government's suit against defendant-appellee, Marvin Redmond d/b/a Redmond Jewelers to recover excise taxes claimed to be owing upon sales of jewelry by defendant. The sin- gle question involved is whether articles of jewelry, sold in large quantities to industrial customers at prices substantially below retail prices were "sold at retail" within the meaning of § 4001 of Internal Revenue Code of 1954 (26 U.S.C.A. § 4001) and of parallel § 2400 of the 1939 Code, where the industrial concerns purchased such articles for distribution as incentive and recognition awards to employees, customers and employees of customers.

The District Judge held that such jewelry had not been "sold at retail" and therefore was not subject to the 10% excise tax imposed by the above mentioned sections of the 1939 and 1954 Internal Revenue Codes. We agree with the District Judge.

Appellee, Redmond, was the proprietor of a downtown ground floor jewelry store in Pontiac, Michigan. Through the years of 1953 to 1956 Redmond sold to Pontiac Motor Division, GMC Truck and Coach Division of General Motors and Baldwin Rubber Company quantities of watches, clocks, pins, tie chains, and some precious stones. The sales to Pontiac and GMC are the ones involved here. Redmond initially paid 10% excise tax on these but such tax was repaid to him upon his applications for refund made in 1957. Apparently Redmond and the Treasury Department were at that time in agreement with Redmond's claim that the jewelry had not been "sold at retail." Later, being of the view that such conclusion was erroneous, the Treasury Department requested Redmond to voluntarily repay what he had received as a refund. He refused and this suit followed.

All of the articles of jewelry, except watches, were sold to Pontiac Motor and GMC Truck pursuant to bids accepted by these concerns. Watches were sold as ordered by them but bids for watches were occasionally submitted prior to and during the periods in question. Apparently Redmond's initial acquisition of the Pontiac and GMC business was by submitting bids therefor as early as 1940. In acquiring and retaining this business, Redmond was competing with the bids of

manufacturers and wholesalers. He testified as to these sales, "my industrial sales * * * are larger quantities, and they were treated as wholesale basis and the terms were the same." He testified that he considered the industrial sales as wholesale because of the quantities sold and the low prices charged. Illustrative of the prices charged in the industrial sales is the case of one type of watch which the manufacturer suggested should retail at $110.00 prior to April 1, 1955 and $105.00 thereafter. This watch was sold by Redmond at an industrial price of $67.40. On another type of watch Redmond's industrial sale price was $66.15 as against the manufacturer's suggested retail price of $165.00 prior to April 1, 1955 and $145.00 thereafter.

The testimony further showed that in his retail sales he adhered always to the suggested retail price. From Redmond's industrial sales to the companies in the vicinity of Pontiac there followed a substantial amount of repair business but the monies received therefor are not involved here.

For the period involved, from January 1, 1953 to September 30, 1956 Redmond's gross receipts, exclusive of federal excise taxes, were $75,593.01 from industrial sales, $128,307.63 from "other sales" (presumably retail sales) and $64,610.45 from "repair sales." Thus it will be seen that of his total business, outside of his income from repair sales, 63% came from retail sales, and 37% from the industrial sales which he considered as wholesale.

The personnel employed in carrying on Redmond's business consisted of himself, an assistant, two full-time watchmakers, Redmond's wife when needed, and two to three part-time watchmakers when needed. All sales were recorded in the books without separation between "retail sales" and "wholesale sales." Separate card accounts for each purchaser were maintained without the card for industrial sales being labeled as "wholesale sales." However all forms of invoice used for Redmond's industrial sales were different in color, serial number, number of copies and contract terms from those used for other sales and the different invoices were kept in separate files. Redmond did not maintain a separate and physically distinct department in his store for the handling of industrial sales nor did he have any personnel who devoted full time to such sales.

The District Judge was of the opinion that Redmond's industrial sales did not constitute jewelry "sold at retail" under the relevant sections of the Code. United States v. Redmond, 205 F.Supp. 858 (E. D.Mich.1962). We would consider Judge Thornton's sound and careful opinion an adequate expression of our own thinking were it not for the fact that at the time of the release of Judge Thornton's opinion, April 24, 1962, the United States Court of Claims opinion in Worrell's Ltd. v. United States, 301 F.2d 317, 93 A.L.R. 2d 1115 (Ct.Cl. April 4, 1962) was not before him or called to his attention. While there are slight factual differences between Worrell and the case at bar, we must recognize it as contrary to Judge Thornton's holding. Respectfully, however, we disagree with Worrell.

Prior to Worrell the decisions dealing with the subject here involved were Gellman v. United States, 235 F.2d 87 (CA 8, 1956); Torti v. United States, 249 F. 2d 623 (CA 7, 1957); and Laufman v. United States, 199 F.Supp. 353 (S.D.Tex. 1961). With slightly variant facts Gellman and Torti support the view we express and were accepted as controlling by the government in its original refund to Redmond. They were relied upon by the District Judge who declined to follow Laufman which is contrary to Gellman and Torti and contrary to our holding here.

The tax statute here involved says:
"§ 4001. Imposition of tax
"There is hereby imposed upon the following articles *sold at retail* a tax equivalent to 10 percent of the price for which so sold:
"All articles commonly or commercially known as jewelry * * *."
(Emphasis supplied.)

Congress did not see fit to set forth any definition of the term "sold at retail." Hence in applying such words to any transaction, we employ their plain, ordinary and commonly understood meaning. Addison v. Holly Hill Fruit Products, 322 U.S. 607, 618, 64 S.Ct. 1215, 88 L.Ed. 1488, 1496; Torti v. United States, supra, 249 F.2d at p. 625; Gellman v. United States, supra, 235 F.2d at pp. 89, 90; West Kentucky Coal Co. v. Walling, 153 F.2d 582, 585 (CA 6, 1946); Old Colony Railway Co. v. Commissioner, 284 U.S. 552, 560, 52 S.Ct. 211, 76 L.Ed. 484, 489. In Addison v. Holly Hill Fruit Products, supra, the question before us is stated: "For the ultimate question is what has Congress commanded, when it has given no clue to its intentions except familiar English words and no hint by the draftsmen of the words that they meant to use them in any but an ordinary sense." (322 U.S. 618, 64 S.Ct. 1221, 88 L.Ed. 1488) (Emphasis supplied.)

We find no difficulty in concluding that large volume bulk sales, at prices competitive with manufacturers and companies conceded to be wholesalers, to purchasers who use them for business purposes are not described by the term "sold at retail." We are satisfied too that the meaning which we find in these words is consistent with the common understanding and usage of the words "wholesale" and "retail" as applied to the buying and selling of merchandise. This view is likewise supported by court decisions and lexicographers. In Roland Electric Co. v. Walling, 326 U.S. 657, 673, 674, 66 S.Ct. 413, 90 L.Ed. 383, 392 the Supreme Court expressed its understanding of the word retail as follows:

"In general usage the noun 'retail' means 'the sale of commodities in small quantities or parcels;—opposed to wholesale.' The verb 're-tail' means 'To sell in small quantities, as by the single yard, pound, gallon, etc.; to sell directly to the consumer; as, to retail cloth or groceries.'" Webster's New International Dictionary Unabridged.

"Wholesaling includes all marketing transactions in which the purchaser is actuated solely by a profit or business motive in making the purchase."

"Retailing includes all marketing transactions in which the purchaser is actuated solely by a desire to satisfy his own personal wants or those of his family or friends through the personal use of the commodity or service purchased. Beckman and Engle in Wholesaling Principles and Practice (1937 p. 25)."

This court in West Kentucky Coal Co. v. Walling, 153 F.2d 582, 585 (CA 6, 1946), had reason to consider the meaning of "retail" as used in a Federal Statute. Judge Allen there remarked that we were not to be controlled by an interpretative bulletin "but seek the congressional intent in the ordinary meaning of the words employed" and adopted Webster's definition which defines a retail sale as a sale " 'in small quantities or parcels * * * directly to the consumer.' This is contrasted with wholesaling, in which the purpose of the customer is to resell the goods or to use them for business needs." (Emphasis supplied.)

The government here, following the reasoning of Laufman and Worrell, argues that such meaning should not be followed in this case because the Supreme Court in Electric Co. v. Walling and we in West Kentucky Coal Co. were dealing with the Fair Labor Standards Act rather than the tax statute here involved. The government contends that the intent of Congress will be better served in this case if we avoid using the commonly understood meaning of the words "sold at retail" and give them a special meaning. We recognize that if Congress desired to have its own words given some special meaning it could have done so by including a definition of them in the act or possibly by saying that their words are subject to definition by appropriate administrative agencies. It did neither. Therefore congressional intent

must be found in the commonly understood meaning of its words. West Kentucky Coal Co. v. Walling, supra; Crane v. Commissioner, 331 U.S. 1, 6, 67 S.Ct. 1047, 91 L.Ed. 1301, 1306; Deputy v. DuPont, 308 U.S. 488, 493, 60 S.Ct. 363, 84 L.Ed. 416, 421; Old Colony Railway Co. v. Commissioner, 284 U.S. 552, 560, 52 S.Ct. 211, 76 L.Ed. 484, 489.

The code sections here involved were adopted in 1941 when the excise tax on jewelry was changed from an imposition on manufacturers, producers and importers to jewelry "sold at retail." (Revenue Act of 1941, 55 Stat. 687 et seq., § 552(a)). In Worrell it is stated that "[t]he major purpose of that act was to increase the national revenues to meet the radical increase in government expenditures for national defense in 1941." (301 F.2d 318). From this premise Worrell and the appellant here, argue that all jewelry should be taxed at some level prior to its ultimate delivery to the consumer. Therefore, they say, Redmond's industrial sales should be taxed as if "sold at retail." We cannot agree. It may be conceded that usually tax statutes express a congressional purpose "to increase the national revenues." We believe, however, that a congressional purpose is implemented by the words of its enactments. If those words are clear, and as seems to be conceded, without ambiguity, courts should find Congress' intent from what it says.

Appellant, as did the Court of Claims in Worrell, asserts that Gellman and Torti are distinguishable from a case like the one at bar because the taxpayers in those cases were primarily wholesalers whereas here the larger part of the taxpayers revenue comes from retail sales. (37% wholesale and 63% retail.) We know of no reason in law or logic why a large or small merchant could not carry on both kinds of business under the same roof and by the same people.

We will not extend this opinion by discussion of Administrative Rulings or Regulations which are apparently at odds with the view we express. Laudable as is a purpose to obtain more revenue for our government, we refrain from judicially amending a clear and unambiguous Act of Congress.

Judgment affirmed.