Fred G. ARKOOSH, Plaintiff,

v.

DEAN WITTER & CO., INCORPORATED, a corporation, Defendant.

Fred G. ARKOOSH, Jr., Plaintiff,

v.

DEAN WITTER & CO., INCORPORATED, a corporation, Defendant.

Civ. Nos. 75–0–503, 75–0–504.

United States District Court,
D. Nebraska.

April 20, 1976.

Gerald Laughlin, of Baird, Holm, McEachen, Pedersen, Hamann & Haggart, Omaha, Neb., for plaintiff.

Eugene Pieper, of Thompson, Crounse & Pieper, Omaha, Neb., for defendant.

## MEMORANDUM

ROBINSON, Senior District Judge.

THIS MATTER is before the Court on the defendant's Motion to Stay these proceedings pursuant to the United States Arbitration Act, 9 U.S.C.A. § 3 (1970).[1] The Court's jurisdiction is found in 28 U.S.C.A. § 1332 (1966).

In early 1975, the plaintiffs and defendant entered into "Customer Agreements" (Filing Number 11, Exhibit A) which generally authorized the defendant, "futures commission merchant", 7 U.S.C.A. § 2 (Supp.1975), to trade in commodity futures contracts for and on behalf of the plaintiffs. Prior to November 3, 1975, the defendant, pursuant to plaintiffs' instructions, had purchased a number of futures contracts for the plaintiffs' accounts. On November 3rd, several of these contracts were liquidated by the defendant after the plaintiffs allegedly failed to answer a margin call. The plaintiffs immediately protested the defendant's action. When the parties were unable to arrive at an amicable settlement of their dispute, the plaintiffs filed a common law action in the Nebraska State Court. On December 24, 1975, the defendant made a written demand upon the plaintiffs for the submission of their dispute to binding arbitration pursuant to paragraph

---

1. 9 U.S.C.A. § 3 (1970) provides:

 "If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceedings with such arbitration."

16 of their Customer Agreement.[2] The plaintiffs did not respond to the arbitration demand and on December 30th the state action was removed to this Court and the pending motion to stay these proceedings was subsequently placed on file.

Since the Customer Agreement clearly evidences a transaction in interstate commerce it would ordinarily be subject to the terms of the United States Arbitration Act.[3] However, the plaintiffs contend that paragraph 16 is void on the grounds that it is contrary to certain provisions of the recently enacted Commodity Futures Trading Commission Act of 1974, 88 Stat. 1389, 7 U.S.C.A. § 2 *et seq.* (Supp.1975). Section 209 of the Act of 1974, 7 U.S.C.A. § 7a(11) (Supp.1975) provides that certain commodity exchanges (known under the Act as a "contract markets") shall

> "provide a fair and equitable procedure through arbitration or otherwise for the settlement of customer's claims and grievances against any member or employee thereof: *Provided,* That (i) the use of such procedure by a customer shall be voluntary, (ii) the procedure shall not be applicable to any claim in excess of $15,-000, (iii) the procedure shall not result in any compulsory payment except as agreed upon between the parties, and (iv) the term 'customer' as used in this paragraph shall not include a futures commission merchant or a floor broker. . ."

It is the plaintiff's contention that the above provision prohibits a futures commission merchant and its customer from agreeing to submit all disputes to compulsory and binding arbitration by an independent organization not associated with the contract market, prior to the time a dispute actually exists between the parties.

First they argue that the enforcement of such arbitration provisions will frustrate the contract market's duty to provide a fair and equitable procedure for the settlement of customer's claims and grievances. Of course, the short answer to this contention is that the grievance procedures of the contract market are expressly voluntary on the part of the customer and he is under no obligation to initiate his claim in that forum if he *voluntarily* chooses to do so elsewhere.

Secondly, the plaintiff contends that a contract market is nothing more than the sum of its members and, therefore, if a contract market is prohibited from establishing a dispute procedure which is *involuntary* and binding in contravention of 7 U.S.C.A. § 7a(11), then a futures commissions merchant which is a "member of the contract market", 7 U.S.C.A. § 2 (supp. 1975), is under a similar prohibition. Since a customer is expressly permitted by § 7a(11) to *agree* to be bound by the decision of the grievance procedures of the contract market, and since § 7a(11) does not expressly refer to private arbitration by an organization which is independent of the contract market and disinterested in the outcome, this argument is necessarily based upon the dual premise that: (1) arbitration pursuant to an *agreement* entered into before a dispute actually arises between the parties (as opposed to arbitration pursuant to a compulsory rule of the contract market) is *involuntary;* and (2) for the purpose of determining the voluntariness of arbitration clauses in Customer Agreements of the

---

2. Paragraph 16 of the parties' "Customer Agreement" provides in part:

"16. Any controversy between . . . (plaintiff and defendant) arising out of or relating to this contract or the breach thereof, shall be settled by arbitration, in accordance with the rules, then obtaining, of either the Arbitration Committee of the Chamber of Commerce of the State of New York, or the American Arbitration Association, or the Board of Arbitration of the New York Stock Exchange, as the undersigned may elect."

3. While the parties have not raised the issue in their arguments it would appear that under Nebraska law arbitration clauses, such as the one involved in this case, are unenforceable under Article I. Section 13 of the Constitution of Nebraska. *Rentschler v. Missouri Pac. Ry. Co.,* 126 Neb. 493, 253 N.W. 694 (1934). However, the contract involved in the present case, is one "evidencing a transaction involving commerce" and is, therefore, subject to the terms of 9 U.S.C.A. § 1 *et seq.* under the Supremacy Clause of the United States Constitution. U.S. Const. Art. VI., cl. 2.

type involved in this case, private arbitration before an independent and disinterested arbitrator is to be treated as substantially equivalent to binding arbitration by the contract market.

 Of course, ordinarily there would be no question of the voluntary nature of plaintiffs' assent to paragraph 16 of the Customer Agreement, in the absence of facts which brought the voluntariness of plaintiffs' assent into question. A contract is, by definition a *voluntary* agreement between the parties. The fact that one or more of the terms of that contract look forward to future contingent events or circumstances is not ordinarily regarded as impinging upon the presumption that the agreement was entered into voluntarily. Nor is it customary for courts to be suspect of the voluntariness of a contract merely because certain contractual terms are more or less advantageous to one or the other of the parties. A contract will invariably involve not only rights, but, obligations for both parties and the mere existence of such obligations does not render a contract involuntary. Accordingly, arbitration clauses in private contracts, which look forward to future contingent events and circumstances, are customarily regarded as an integral part of the parties voluntary agreements, Cf. *Crane & Rigging Co. v. Docutel Corp.,* 371 F.Supp. 240 (E.D.N.Y.1973), unless a party to a contract can establish that his assent was the product of the wrongful conduct of the other party. *U. S. for Use of Moseley v. Electronic & Missile Facilities, Inc.,* 374 U.S. 167, 83 S.Ct. 1815, 10 L.Ed.2d 818 (1963); *Hellenic Lines Limited v. Louis Dreyfus Corp.,* 372 F.2d 753 (2nd Cir. 1967). However, the term *voluntary* cannot be given an unyielding definition appropriate in all circumstances and applicable regardless of the context in which it is used. In the present case, that word is used in the context of a statute which is part of a sophisticated regulatory scheme. Therefore, it is possible that it has been used as a term of art and that it has a content which it would not otherwise be given in the context of a dispute arising at common law. *See N. L. R. B. v. Hearst Publications, Inc.,* 322 U.S. 111, 120–22, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).

In order to determine the statutory definition of the term *voluntary* it may be helpful to briefly describe the conditions which brought about the enactment of the Act of 1974, the changes in federal policy accomplished by the Act, and the relevant provisions dealing with the settlement and adjudication of customers' claims and grievances.

Prior to the enactment of the Act of 1974 federal policy toward commodity futures trading was based upon the assumption that the price mechanism of the contract markets would function best, if regulation of the markets was left largely in the hands of the markets themselves, with only marginal federal supervision through the Commodity Exchange Authority within the Department of Agriculture. For a variety of reasons this policy was found by Congress to be ill-suited to the present and future needs of the commodity futures market. Though Congress was primarily concerned with the technical aspects of commodity trading, there was also evidence before the Congress suggesting that the contract markets were unable or willing to establish necessary trading policies and practices and to adequately police the questionable trading practices of their members. Furthermore, there was evidence before the Congress that the markets had denied certain basic procedural rights to persons bringing claims and grievances against members of the market,[4] and that the existing administrative agency lacked competent manpower and was otherwise slow, cumbersome and ineffective in administering government policies regarding the trading of commodity futures.

The Act of 1974 made certain changes in federal policy. Though it retained an element of market self regulation, its emphasis shifted to federal regulation of the con-

---

4. *Hearings on S.2485, S.2578, S.2837, H.R. 13113 Senate Comm. on Agriculture and For-* *estry,* 93rd Cong., 2nd Sess., pt. 2, p. 629, *et seq.*

tract markets though the Commodity Futures Trading Commission, (CFTC) an independent agency with vast administrative capacity and sufficient regulation authority to insure the promotion of the public interest.

One significant aspect of this new federal policy was the establishment of a multi-tier procedure for handling customer claims and grievances. The first rung in this system is that established by § 7a(11). This, of course, is the procedure of the contract market itself. It is expressly made voluntary and non-binding unless the parties specifically agree to be bound by the markets decision. Section 7a(11) provides that the contract market may entertain "customers' claims and grievances against any member . . . . (of the contract market)". Therefore, whether the dispute involves a violation of the statute, or merely a common law claim, the customer has the option of seeking an amicable settlement through the contract market.

If a customer wishes to forego the procedures of the contract market, or if he chooses not to adhere to the decision of the contract market and has not voluntarily bound himself to its decision, he may take his claim to the next tier in the grievance process. If the customer is a "person complaining of any violation of any provisions of . . . (title 7, chapter 1) or any rule, regulations or order thereunder by any person registered . : . (under specific provisions of title 7, chapter 1)" then he may file a complaint with the CFTC which is authorized· to investigate and adjudicate such claims. 7 U.S.C.A. § 18 (Supp.1975). The order of the CFTC is appealable to the federal courts under the provisions of 7 U.S.C.A. §§ 18(f), 18(g) (Supp.1975), and the Administrative Procedure Act, 5 U.S.C.A. §§ 701 et seq. (1967).

■ If the customer's claim does not arise out of a violation of the statute, but rather out of a violation of the common law, then, presumably, he may take his claim to state or federal court.[5]

It is eminently clear that Congress intended to prohibit a contract market from establishing any rule or regulation which would require customers to submit to the binding arbitration of the market itself. 7 U.S.C.A. § 7a(11). Such a rule would be clearly *involuntary* and violative of the Act. It is also reasonable to conclude that Congress did not intend for the prohibitions of § 7a(11) to be circumvented by the simple expedient of requiring commodity traders to agree to arbitration by the contract market in a standard form "Customer Agreement" as a condition precedent to trading on the contract market. However, this case does not involve an agreement to submit to the binding arbitration of the contract market. Involved here is an agreement to submit to arbitration by one of three private and disinterested organizations. So far as this Court can tell, Congress had no evidence before it suggesting that such private arbitration was a burden upon commodity future trading.

■ Private arbitration of disputes has been Congressionally 9 U.S.C.A. § 2 (1970), and judicially, *Barrett v. Manufacturers Ry. Co.,* 453 F.2d 1305 (8th Cir. 1972), approved for use in all areas of commerce unless such approval is expressly or impliedly withdrawn. *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953). In the present case it is difficult to find any justifiable reason, from the language of the statute, its legislative history, or the independent research of the plaintiffs and the Court for applying the same technical standard of voluntariness to private arbitration before an independent and disinterested arbitrator, as is applied to arbitration within

---

**5.** The Seventh Amendment to the United States Constitution assures civil litigants the right to trial by jury in suits which were triable to a jury at common law. The present case is a common law action for breach of contract. Accordingly, the parties would appear to be entitled to a jury trial. Since judicial review of the Commission's findings and order under 7 U.S.C.A. § 18 seems to preclude trial to a jury, it is presumed that suits involving only common law claims would be within the jurisdiction of state or federal courts rather than the Commission.

the contract market. There were specific examples before Congress of abuses practiced by the contract market,[6] but no suggestion that such abuses extended over into the area of private arbitration by an independent and disinterested arbitrator. The only reason suggested for holding private arbitration to the same standard as market arbitration is the fact that the CFTC has recently proposed Regulation § 180.3 which provides:

"(a) The use by customers of the procedure established by a contract market pursuant to the Act shall be voluntary. In that connection the procedure established shall prohibit any agreement or understanding pursuant to which customers agree to submit claims or grievances for settlement under the procedures so established prior to the time when the claim or grievance arose.

"(b) No future commission merchant, floor broker, associate person or any other person registered with the Commission under the Act shall enter into any agreement or understanding with a customer in which the customer agrees to submit a claim or grievance pertaining to any matter or transaction subject to the jurisdiction of the Commission to any settlement procedure prior to the time such claim or grievance arose. . . ."

40 Fed.Reg. 54430.

At the present time the above-quoted regulation is only *proposed* and, as such, is binding on no one, until the rule making procedures of § 4 of the Administrative Procedure Act, 5 U.S.C.A. § 553 (1967) have been completed. However, to the extent that § 180.3 represents an authoritative construction of § 7a(11) it will be considered by the Court with the deference to which it is entitled, *NLRB v. Hearst, Publications, Inc., supra* 322 U.S. at 130, 64 S.Ct. 851, even though in its present status it must be regarded as an *ex-parte* statement of policy or position rather than an established regulation or the rule of an administrative adjudication. *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

The task of determining whether or not proposed Regulation § 180.3(b) (involving arbitration by an outside arbitrator) is *interpretative,* and, therefore, entitled to a measure of deference from this Court, or *legislative* pursuant to 7 U.S.C.A. §§ 12a(5), 12a(8) and, therefore, effective only after the rule making procedure of § 4 of the Administrative Procedure Act has been fulfilled is at best difficult. However, the Court finds some guidance in this matter in the case of *Addison v. Holly Hill Fruit Products, Inc.,* 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944). The issue in that case may be described briefly as whether or not a regulation, duly enacted by the Administrator of the Wage and Hour Division of the Department of Labor pursuant to the Fair Labor Standards Act, 29 U.S.C.A. §§ 201 *et seq.* (1975) was a valid subject of administrative rule-making under the enabling provisions of the Act. In making that determination it would seem that the Court has given some insight into the distinction between an *interpretative rule* (exempt from the procedures of § 4 of the Administrative Procedure Act, 5 U.S.C.A. § 553(b)(A)) and a *legislative rule* (which must comply with § 4 before it is valid and enforceable). The court said:

"The wider a delegation (of authority) is made by Congress to an administrative agency the more incomplete is a statute and the ampler the scope for filling in, as it is called, its details. But when Congress wants to give wide discretion it uses broad language. . . . [But] (in the case at bar) Congress did otherwise. It dealt with (the) exemptions (in issue in the case) in detail and with particularity. . . . In short the Administrator was not left at large. A new national policy was here formulated with exceptions catalogued with particularity and not left within the broad dispensing power of the Administrator. Exemptions made in such detail preclude their enlargement by implication."

*Id.,* 332 U.S. at 616–17, 64 S.Ct. at 1220–21. The duly enacted Regulation by the Admin-

---

6. *See supra* n. 4.

istrator of the Wage and Hour Division of the Department of Labor was thus struck down as an interpretative rule which was invalid under the language of the enabling statute.

■ There are important similarities between the Court's discussion in the *Addison* case and the issues in the case at hand. The relevancy of proposed Regulation § 180.3(b) as an interpretation of § 7a(11) is lost when consideration is given to the Commissioner's interpretative authority under § 7a(11) in light of the discussion in *Addison.* The narrow scope of the language of § 7a(11) is an example of a statutory requirement made with such particularity, in light of both language and legislative history, as to preclude this Court from drawing an interpretative significance from proposed Regulation § 180.3(b). That is not, of course, to suggest that § 180.3(b) may not be valid once the appropriate procedural steps have been taken under § 4 of the Administrative Procedure Act. Congress granted very broad rule-making power to the Commission in subsequent sections of the Act. *See* 7 U.S.C.A. §§ 12a(5), 12a(7), *but see Addison v. Holly Hill Fruit Products, Inc., supra.* However, the foregoing discussion does demonstrate that § 180.3(b) is a legislative rather than an interpretative rule, subject to the requirements of § 4 of the APA and therefore is not enforceable in

its present status, and is of extremely limited usefulness as an interpretative aid to § 7a(11).

■ In light of the foregoing discussion the Court finds no justifiable reason for denying the enforcement of paragraph 16 of the parties' Customer Agreement. Neither the language of the statute, nor the legislative record suggests that Congress was knowledgeable of, or concerned with, abuses suffered by commodity traders at the hands of private, disinterested, and independent arbitrators.[7] Furthermore, the statutory goal of assuring Commission review of the decisions of the contract market is not served when the customer is not subjected to the procedures of the contract market, or alternative procedures containing a substantially similar possibility for the abusive practices which were of concern to Congress.[8] Consequently, the Court must conclude that proposed Regulation § 180.3, as it relates to the private arbitration of common law rights between a futures commission merchant and his customers is based upon independent findings of the CFTC and is promulgated pursuant to the Commission's plenary authority to enact needful rules and regulations under 7 U.S.C.A. §§ 12a(5) and 12a(8). As such the proposed regulation in its present status is not and should not be binding upon the parties, or accorded the weight of an au-

---

7. Proposed Regulation § 180.3 also tends to insure the Commission's adjudicatory jurisdiction under 7 U.S.C.A. § 18. It is extremely difficult for parties to foresee the dimensions which a subsequent dispute may take. If that dispute should involve a construction of the parties' rights under the Act it is obviously advantageous for customers to have access to the CFTC which is now the repository of expertise on traders' rights under the Act of 1974. Agreeing to private arbitration before the dimensions of the dispute are known may place a hardship upon the customer because arbitration usually means that the parties will be less certain of the correctness of the legal result. Of course, this rationale, does not obtain where, as here, the only rights involved are those arising at common law. Courts are the repository of expertise in the common law and both Congress and the courts have accepted private arbitration as a useful and often attractive substitute for protracted litigation.

8. It is noteworthy that the present case involves neither (1) an agreement to submit to the binding arbitration of the contract market, nor (2) a dispute within the adjudicatory jurisdiction of the Commission. 7 U.S.C.A. § 18 (supp.1975). Since the agreement involved in this case does not subject the plaintiff to the procedures of the contract market, the Court's ruling does not establish a dual definition for the statutory term *voluntary.* Furthermore, since the present dispute involves common law rights and is not within the Commission's adjudicatory jurisdiction under § 18, but rather within the jurisdiction of the Court, the policy of the United States Arbitration Act, 9 U.S.C.A. § 1 *et seq.,* has more significance for this case than it would for a case involving the private arbitration of a dispute within the Commission's adjudicatory jurisdiction.

thoritative interpretation by an agency charged with the administration of the Act.

Accordingly, paragraph 16 of the parties "Customer Agreement" is not violative of the Act of 1974 and is enforceable unless invalid for some other reason.

In this regard, plaintiffs contend that their Customer Agreements with the defendant are contracts of adhesion and that paragraph 16 is void on the grounds that they had no meaningful choice in assenting to its terms.

 The parties Customer Agreement is contained in a printed, standard form or boiler plate document and this, in conjunction with the relative bargaining positions of the parties might lend some substance to the plaintiffs' claim that the agreements are adhesion contracts. *See Chandler v. Aero Mayflower Transit Co.,* 374 F.2d 129, 135 n. 11 (4th Cir. 1967). However, the use of a standard form contract and the existence of relatively unequal bargaining positions, standing alone, does not invalidate an otherwise valid contract, or any particular term in that contract which is not *unreasonably* favorable to the stronger party, or unfair to the weaker party.[9] In determining whether or not a term is reasonable or fair it has been said that

"the primary concern must be with the terms of the contract considered in light of the circumstances existing when the contract was made. The test is not simple, nor can it be mechanically applied. The terms are to be considered 'in the light of the general commercial background and the commercial needs of the particular trade or case.' Corbin suggests the test as being whether the terms are 'so extreme as to appear unconscionable according to the mores and business practices of the time and place.' We think this formulation correctly states the

test to be applied in those cases where no meaningful choice was exercised upon entering the contract." (citations omitted). *Williams v. Walker-Thomas Furniture Co.,* 121 U.S.App.D.C. 315, 350 F.2d 445, 450 (1965).

In the present case, the plaintiffs contend that they had no meaningful choice as to whether or not to submit their claim to private arbitration and that arbitration by organizations which are independent and disinterested parties to this controversy is *unreasonably* unfair to them, or favorable to the defendant. Specifically, they claim that it is unreasonably unfair to them to enforce a waiver of the right to trial by jury in a standard form contract.

 This argument would have great force if it could be presumed that the plaintiffs were prejudiced by the unwilling waiver of their Seventh Amendment rights. However, courts and juries are neither infallible, nor are they always the best forum for resolving commercial disputes. Arbitration is often a valuable tool in stabilizing ongoing contractual relationships because it can often provide a final result in less time and with less expense than required for protracted litigation. It is true that arbitration involves less certainty in the correctness of the legal result. However, the benefits of arbitration would be grossly underestimated if it were presumed that this would result in severe disadvantage to the parties. So long as the arbitration procedures are fair, and the arbitrator is competent, independent and disinterested it may truly be said that both parties to arbitration have a reasonable opportunity to present their case and a reasonable expectation of a fair and impartial determination.

 The plaintiffs contend that the case of *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), supports

---

**9.** It is important to bear in mind that every contractual term creating an obligation, liability, or duty *imposes* a burden upon someone. It is also important to note that many contracts including negotiated contracts involve a weaker and a stronger bargaining party. The law does not prohibit parties from contracting for

their mutual advantage merely because one party has an obvious bargaining advantage, nor does it invalidate reasonable burdens placed upon the weaker party to a transaction. Such a rule would be far more harmful to the weaker party, than the use standard form contract, or the imposition of a reasonable burdens.

their position that a contractual waiver of due process rights in a commercial setting marked by the inequal bargaining position of the parties, and a standard form contract should preclude the enforcement of paragraph 16 of the Customer Agreement involved in this case. However, the Court is convinced that the differences between the circumstances in *Fuentes* and the situation in the present case far outweighs the similarities. When a term in a standard form contract requires a weaker party to waive rights which seriously alter the weaker party's reasonable expectations under the contract, or frustrate or deny the weaker party's right to present his case, and receive a fair and impartial decision on its merits, courts must carefully scrutinize the transaction for evidence of overreaching and unconscionability. But, in the present case no such claim is made. To be sure the right to trial by jury is an important constitutional right. But the right is not of such a nature that its waiver in lieu of arbitration places either party under an unreasonable burden, or gives either party an unreasonable advantage. Cf. *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971). Consequently, the Court simply cannot find that an agreement to arbitrate disputes before an independent and impartial private arbitrator, imposed by the terms of a standard form contract, is unconscionable and, therefore, unenforceable under the circumstances of this case. Since the Court has concluded that private arbitration is not an unconscionable substitute for trial by jury under the circumstances of this case, it shall not be necessary to conduct an evidentiary hearing to determine whether paragraph 16 was *imposed* upon the plaintiffs.