**Henry ALKEN, Plaintiff,**

v.

**Stanley LERNER and E. F. Hutton & Co., Inc., Defendants.**

**Civ. A. No. 79–0023.**

United States District Court,
D. New Jersey.

Feb. 22, 1980.

---

Wayne D. Greenstone, Greenstone, Greenstone & Naishuler, Newark, N. J., for plaintiff.

James Greenberg, Greenberg, Shmerelson, Greenberg & Weinroth, Camden, N. J., and Daniel E. Bacine, Barrack, Rodos & McMahon, Philadelphia, Pa., for defendants.

## OPINION

GERRY, District Judge.

This is an action for violations of the anti-fraud provisions of the Commodity Exchange Act (the "Act"), as amended by the Commodity Futures Trading Commission Act of 1974, 7 U.S.C. § 1 *et seq.*,[1] and of common law fiduciary duties owed by professionals to a customer. In addition, plaintiff alleges that defendants acted negligently with respect to his commodity trading account with defendants. Jurisdiction is predicated upon 28 U.S.C. § 1331. Defendants now move, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings, raising, *inter alia*, the legal insufficiency of the complaint.[2]

In considering a motion for judgment on the pleadings, this court is required to view the facts presented in the pleadings and the inference to be drawn therefrom in the light most favorable to the non-moving party. 5 C. Wright & A. Miller *Federal Practice and Procedure* § 1368 (1969). The motion will be granted only if the movant establishes that no material issue of fact awaits resolution and that he is entitled to judgment as a matter of law. *Greenberg v. General Mills Fun Group, Inc.*, 478 F.2d 254, 256 (5th Cir. 1973); *Commerce National Bank in Lake Worth v. Baron*, 336 F.Supp. 1125, 1126 (E.D.Pa.1971).

## FACTUAL BACKGROUND

On or about January 25, 1977, plaintiff Henry Alken opened an account in the Cherry Hill office of defendant Hutton for investing in commodity futures contracts. From the time the account was opened until October 30, 1978, Hutton executed numerous commodity futures contracts for the account of and on behalf of the plaintiff.

Pursuant to the rules of the relevant contract market and the customer agreement with the commodity merchant that must be signed prior to the opening of an account, plaintiff was required to have in his account a certain sum of money, initial margin, for each contract purchased or sold. As the value of contracts fluctuates with market prices, a certain level of margin must be maintained in the customer account for each contract. The funds available in a commodity customer account which are not set aside as margin are known as equity. This sum represents funds which can be used as initial margin for additional purchases and sales, or as maintenance margin should the prices of the contracts held by the customer move adversely to his position.

On or about October 30, 1978, plaintiff Henry Alken telephoned defendant Stanley Lerner, then assistant manager of Hutton's Cherry Hill office, and the individual responsible for the handling of plaintiff's account, to inquire as to the current margin and equity positions in his account, since he was considering the purchase of additional contracts. Defendant Lerner, as the agent, servant and employee of the defendant Hutton, responded that the plaintiff had

---

1. For a detailed history of the Commodity Exchange Act, *see Smith v. Groover*, 468 F.Supp. 105, 108–12 (N.D.Ill.1979).

2. Although defendants challenge only plaintiff's cause of action based on the fraud provisions of the Commodity Exchange Act, 7 U.S.C. § 6b, a ruling in defendants' favor would result in a dismissal of the state law counts of plaintiff's complaint for lack of subject matter jurisdiction in this court.

sufficient money in his account to purchase these contracts.

The plaintiff, in reliance upon the representation of defendant Lerner, purchased two Deutsche mark futures contracts, two Swiss franc futures contracts and two British pound futures contracts on the International Monetary Market of the Chicago Mercantile Exchange.

At no time prior to the transactions of October 30, 1978 had plaintiff been informed that the exchange had raised initial and maintenance margin requirements for traders with respect to these contracts, and that defendant Hutton had removed plaintiff's name from a list of customers entitled to maintain minimum margins. Instead of a $12,800.00 margin requirement, an amount which plaintiff had derived from information furnished periodically to him by defendant Lerner, the margin requirement was in fact $27,000.00.

As the direct and proximate result of the fraudulent statements and misrepresentations made by defendants to plaintiff with respect to required margin level, plaintiff was induced to purchase the contracts on October 30, 1978.

Later that week, defendant Lerner advised plaintiff that his margin requirement had been substantially raised, materially affecting his equity position. When plaintiff was informed of the change in his equity, he immediately notified defendant in an effort to mitigate any accruing loss and instructed defendants to sell his contracts on the International Monetary Market. However, by that time, prices had moved so adversely to plaintiff's position that all of the equity in his account was depleted. Plaintiff sustained monetary losses.

## DISCUSSION

In essence, plaintiff alleges an implied private right of action under the anti-fraud provisions of the Commodity Exchange Act, 7 U.S.C. § 6b. Defendants contend, as a matter of law, that no such private right of action can be implied and, assuming that such an action could be brought, plaintiff must first present his claim to the Commod-ity Futures Trading Commission ("CFTC") and exhaust his remedies therein.

This court does not write on a clean slate. A private right of action was recognized to enforce the anti-fraud provisions of the Commodity Exchange Act prior to 1974. *Deaktor v. L.D. Schreiber & Co.,* 479 F.2d 529 (7th Cir. 1973), *rev'd on other grounds,* 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1974) (7 U.S.C. § 13(b)—anti-manipulation provision); *Booth v. Peavey Company Commodity Services,* 430 F.2d 132 (8th Cir. 1970) (7 U.S.C. § 6(b)—anti-fraud provision); *Arnold v. Bache & Co., Inc.,* 377 F.Supp. 61 (M.D.Pa.1973) (§ 6(b)); *Johnson v. Arthur Espey, Shearson, Hammill & Co.,* 341 F.Supp. 764 (S.D.N.Y.1972) (§ 6(b)); *McCurnin v. Kohlmeyer & Co.,* 340 F.Supp. 1338 (E.D.La.1972) (§ 6(b)); *United Egg Producers v. Bauer Int'l. Corp.,* 311 F.Supp. 1375 (S.D.N.Y.1970) (§ 13(b)); *Goodman v. H. Hentz & Co.,* 265 F.Supp. 440 (N.D.Ill.1967) (§ 6(b)).

The Act, however, was extensively amended in 1974. Thus the instant controversy centers on the effect of the amendments on the previously recognized implied private right of action.

Since the passage of the 1974 amendments, seven district courts have indicated, either expressly or by implication, that the amendments abolished the judicially created private remedy. *Fischer v. Rosenthal & Co.,* 481 F.Supp. 53 (N.D.Tex.1979); *National Super Spuds, Inc., v. New York Mercantile Exchange,* 470 F.Supp. 1256 (S.D.N.Y. 1979); *Alkan v. Rosenthal & Co.,* [1979] Comm.Fut.L.Rep. (CCH) ¶ 20,797 (S.D.Ohio 1979); *Berman v. Bache, Halsey, Stuart, Shields, Inc.,* 467 F.Supp. 311 (S.D.Ohio 1978); *Bartels v. International Commodities Corp.,* 435 F.Supp. 865 (D.Conn.1977); *Consolo v. Hornblower & Weeks-Hemphill, Noyes, Inc.,* 436 F.Supp. 447 (N.D.Ohio 1976); *Arkoosh v. Dean Witter & Co., Inc.,* 415 F.Supp. 535 (D.Neb.1976), *aff'd on other grounds,* 571 F.2d 437 (8th Cir. 1978). On the other hand, at least ten district courts have continued to recognize a private right of action under the Act. *R.J. Hereley &*

*Son v. Stotler & Co.*, 466 F.Supp. 345 (N.D. Ill.1979); *Smith v. Groover*, 468 F.Supp. 105 (N.D.Ill.1979); *Jones v. B.C. Christopher & Co.*, 466 F.Supp. 213 (D.Kan.1979); *Gravois v. Fairchild, Arbatziz & Smith, Inc.*, [1978] Comm.Fut.L.Rep. (CCH) ¶ 20,706 (E.D.La. 1978); *Berenson v. Madda Trading Co.*, No. 78–544 (D.D.C. Oct. 30, 1978); *Hofmayer v. Dean Witter & Co., Inc.*, 459 F.Supp. 733 (N.D.Cal.1978); *Kelley v. Carr*, 442 F.Supp. 346 (W.D.Mich.1977); *Bache, Halsey, Stuart, Inc. v. French*, 425 F.Supp. 1231 (D.D.C.1977); *Shearson Hayden Stone, Inc. v. Lumer Merchants, Inc.*, 423 F.Supp. 559 (S.D.Fla.1976); *E.F. Hutton & Co., Inc. v. Lewis*, 410 F.Supp. 416 (E.D.Mich.1976). Although the circuit in which this court sits has not considered whether a private remedy for fraud exists under the amended Act, two circuits have recognized such a private right. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Goldman*, 593 F.2d 129 (8th Cir. 1979); *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96 (7th Cir. 1977).[3]

I

Private rights of action do not require express statutory authorization. *Texas & Pacific Railway Co. v. Rigsby*, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916); *Tunstall v. Brotherhood of Locomotive Firemen & Enginemen*, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944). The question whether a statute creates a cause of action, either expressly or impliedly, is basically a matter of statutory construction. *Transamerica Mortgage Advisors, Inc. v. Lewis*, —— U.S. ——, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). While some cases have placed considerable emphasis on the desirability of implying private remedies to effectuate the purposes of the statute, *see e. g., J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), recent Supreme Court decisions have indicated that the implication of a private right of action "is limited solely to determining whether Congress intended to create the private right of action." *Touche Ross & Co. v. Redington*, 442

U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). *See also Transamerica Mortgage Advisors, Inc. v. Lewis*, —— U.S. ——, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

This court will attempt to determine the intent of Congress with respect to the Commodity Exchange Act by utilizing as the focus of analysis the four factors outlined by the Supreme Court in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *Transamerica Mortgage Advisors, Inc. v. Lewis*, —— U.S. ——, ——, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979) (White, J., dissenting); *Cannon v. University of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). The inquiry undertaken here differs, however, from those pursued recently by the Supreme Court. In the instant case, the issue is not whether Congress intended to *create* an implied private right of action: Before 1974, such a cause of action was widely recognized. Rather, the question is whether the 1974 amendments manifested an intent to *nullify* those court decisions which had recognized an implied right of action under the Act.

II

The threshold question under *Cort* is whether the statute was enacted for the benefit of an *especial* class of which the plaintiff is a member; that is, does it create a federal right in favor of the plaintiff? 422 U.S. at 78, 95 S.Ct. at 2087. The language of the Act itself answers this question. Under 4b of the Act, 7 U.S.C. § 6b, it is unlawful for any contract market member in connection with trading on a contract market to engage in fraudulent conduct with respect to that person.

Furthermore, at the time of reporting the 1974 amendments, the House Agriculture Committee reiterated the importance of speculators in the commodity futures trading market and the necessity of regulating

**3.** Two other circuits have assumed, without deciding, the existence of a private right of action. *See Master Commodities, Inc. v. Texas Cattle Management Co.*, 586 F.2d 1352 (10th Cir. 1978); *Moody v. Bache & Co., Inc.*, 570 F.2d 523 (5th Cir. 1978).

that market to protect these investors. H.R.Rep. No. 93–975, 93d Cong., 2d Sess. (1974) at 35. Individual congressional members also emphasized the importance of protecting commodity traders. 120 Cong. Rec.S. 30466 (1974) (remarks of Senator Dole); *accord* 120 Cong.Rec.S. 34998, 34999 (1974) (remarks of Senator Clark). As Senator Dole expressed, the chief purposes of the 1974 amendments are to protect "against manipulation of markets and to protect any individual who desires to participate in futures market trading."

Thus, the first of the *Cort* factors favors the implication of a private right of action. The Commodity Exchange Act explicitly confers a benefit on commodities investors, and the plaintiff is clearly a member of the protected class.

The second, and most important, inquiry under *Cort* is whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one. *Cannon v. University of Chicago,* 441

U.S. 677, 694, 99 S.Ct. 1946, 1956, 60 L.Ed.2d 560 (1979).

By its terms, section 4b of the Commodity Exchange Act merely prohibits certain conduct: It does not create or deny any civil liabilities.[4] The legislative history at the time of the Act's enactment is silent as to whether Congress intended this provision to be enforced through private litigation. This is not surprising since the original Act did not expressly provide private remedies in favor of anyone, and since Congress has traditionally relied on the judiciary to imply such remedies, rather than determining the question for itself. *See Cannon v. University of Chicago,* 441 U.S. 677, 718, 99 S.Ct. 1946, 1968, 60 L.Ed.2d 560 (1979) (Rehnquist, J., concurring). Although recent Supreme Court cases have warned that in the future the court would be reluctant to imply a private remedy absent specificity by the Legislative Branch, *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), *Cannon v. University of Chicago,* 441 U.S. 677, 718, 99 S.Ct. 1946,

4. Section 4b of the Act, 7 U.S.C. § 6b provides:

§ 6b. Contracts designed to defraud or mislead; bucketing orders; buying and selling orders for commodities.

It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person, or (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person if such contract for future delivery is or may be used for (a) hedging any transaction in interstate commerce in such commodity or the products or by-products thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof—

(A) to cheat or defraud or attempt to cheat or defraud such other person;

(B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;

(C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person; or

(D) to bucket such order, or to fill such order by offset against the order or orders of any other person, or willfully and knowingly and without the prior consent of such person to become the buyer in respect to any selling order of such person, or become the seller in respect to any buying order of such person.

Nothing in this section or in any other section of this chapter shall be construed to prevent a futures commission merchant or floor broker who shall have in hand, simultaneously, buying and selling orders at the market for different principals for a like quantity of a commodity for future delivery in the same month, from executing such buying and selling orders at the market price: Provided, That any such execution shall take place on the floor of the exchange where such orders are to be executed at public outcry across the ring and shall be duly reported, recorded, and cleared in the same manner as other orders executed on such exchange: And provided further, That such transactions shall be made in accordance with such rules and regulations as the Commission may promulgate regarding the manner of the execution of such transactions.

1968, 60 L.Ed.2d 560 (1979) (Rehnquist, J., concurring), Congress cannot be faulted for failing to anticipate these admonishments when it adopted the original Act.

█ In 1974, the Act was extensively amended. However, these changes were never intended to restrict those rights that were already available to commodity investors. When it passed the Commodity Futures Trading Commission Act, Congress was under the impression that section 4b could be enforced by a private action. Remarks of Rep. Poage, Chairman of the House Committee on Agriculture, 119 Cong. Rec.H. 11353, 41333 (1973); Hearings on H.R. 11955, before the House Committee on Agriculture, 93d Cong., 2d Sess. (1974) at 249, 321; Hearings on S. 2485, S. 2578, S. 2837 and H.R. 13113 before the Senate Committee on Agriculture and Forestry, 93d Cong., 2d Sess. pt. 3 (1974) at 737, 746 (Testimony of Professor Roy Shotland). Whether the lower federal courts had correctly implied a private remedy is immaterial, "[f]or the relevant inquiry is not whether Congress had correctly perceived the then state of the law, but rather what its perception of the state of the law was." *Brown v. General Services Administration,* 425 U.S. 820, 828, 96 S.Ct. 1961, 1966, 48 L.Ed.2d .402 (1976). Since Congress was familiar with the federal courts' decisions, recognizing an implied right of action, there is a presumption that it expected its enactment to be interpreted in conformity with them. This presumption is rebuttable only by a clear expression of its intent to deny a private cause of action.[5] *Cannon v. University of Chicago,* 441 U.S. 677, 710–12, 99 S.Ct. 1946, 1964–65, 60 L.Ed.2d 560 (1979).

█ Defendants argue that Congress' consideration and rejection of three bills which expressly provided for private damage remedies forecloses implication of such a right. *See* H.R. 11195, 93d Cong., 1st Sess. § 17(3) (1973); S. 2837, 93d Cong., 1st Sess. § 505 (1973); S. 2578, 93d Cong., 1st Sess. § 20(3) (1973). The failure of Congress to enact legislation, however, is not always a reliable indicator of legislative intent. *Transamerica Mortgage Advisors, Inc. v. Lewis,* —— U.S. ——, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979); *Red Lion Broadcasting Co. v. Federal Communications Commission,* 395 U.S. 367, 388, 89 S.Ct. 1794, 1805, 23 L.Ed.2d 371 n.11 (1969); *Fogarty v. United States,* 340 U.S. 8, 13–14, 71 S.Ct. 5, 8, 95 L.Ed. 10 (1950). In the present action, the three bills to which defendants refer all contained provisions for the recovery of treble damages, a remedy previously unavailable to investors suing under the anti-fraud provisions. This court interprets Congress' failure to enact any of these bills into legislation merely to evidence a reluctance to expand private recovery under the existing private right. Because Congress did not express clearly an intent to nullify the federal court decisions which had unanimously recognized an implied private right of action under the anti-fraud provisions of the Act, the court finds that Congress intended the private cause of action to survive the 1974 amendments.[6]

That Congress in 1974 provided for a reparations procedure before the Commission, 7 U.S.C. § 18(c), does not change this court's position. The reparations provision, section 14 of the Commodity Futures Trading Commission Act, states that an individual injured as a result of violations of the

---

**5.** As the Court noted in *Cannon*:

[T]he legislative history of a statute that does not expressly create or deny a private remedy will typically be equally silent or ambiguous on the question. Therefore, in situations such as the present one "in which it is clear that federal law has granted a class of persons certain rights, it is not necessary to show an intention to *create* a private cause of action, although an explicit purpose to deny such cause of action would be controlling." *Cort, supra,* 422 U.S. at 82, 95 S.Ct. 2080, 2090 (emphasis in original). 441 U.S. at 694, 99 S.Ct. at 1956.

The Court has stated that this "intent may appear implicitly in the language of structure of the statute, or in the circumstances of its enactment." *Transamerica Mortgage Advisors, Inc. v. Lewis,* —— U.S. ——, ——, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979).

**6.** The separate question whether Congress intended the private litigant to exhaust his administrative remedies before the Commission prior to suing in federal court will be addressed in a later section of this opinion.

Act "may elect to" pursue his remedy before the Commission. This choice of language suggests that the administrative procedure is merely one of several alternatives available to an aggrieved party. More importantly, Congress was well aware that a number of federal courts had implied a private right of action under the Act. If it had wanted to abrogate this right of action, Congress would have expressed this intention in some way. To this court's knowledge, nowhere in the legislative history accompanying the 1974 amendments is there any indication that Congress desired to alter this previously recognized right. In the absence of such an expression, this court will not assume an intent to abrogate existing rights. *Cf. Tennessee Valley Authority v. Hill,* 437 U.S. 153, 189, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978) (cardinal rule that repeal by implication is not favored).

■ The inclusion of a *parens patriae* remedy in the 1978 amendments to the Act, 7 U.S.C. § 13a–2, is consistent with this conclusion. Again, Congress was aware that several federal courts had recognized a private right of action in fraud, yet it chose not to alter this right. Further, it would have been anomalous for Congress to allow state attorney generals direct access to federal courts, while denying without explanation that option to those persons with the greatest stake in the resolution of a commodity-related dispute. In short, the provision of a *parens patriae* remedy in the 1978 amendments indicates a congressional judgment that additional remedies were needed to regulate effectively the commodity futures markets.[7]

■ The third element of the *Cort* analysis concerns the compatibility of a private remedy with the underlying purposes of the Act. Although a private right of action will not be implied if it would frustrate the legislative purpose, "when that remedy is necessary or at least helpful to the accomplishment of the statutory purpose, the Court is decidedly receptive to its implication under the statute." *Cannon v. University of Chicago,* 441 U.S. 677, 703, 99 S.Ct. 1946, 1961, 60 L.Ed.2d 560 (1979). A private cause of action is certainly one way in which to achieve the purposes of the statute. Affording complaining investors a multiplicity of remedies will assist in regulating the commodity futures markets and deterring fraud and misrepresentation by futures traders. Additionally, actions in fraud have traditionally been handled by the courts, and seldom require a special knowledge of the commodities market.

The Commission itself perceives no inconsistency between the private remedy and the public remedy. 41 Fed.Reg. 37597, 37598 (September 7, 1976). In fact, in light of the backlog of cases before the Commission, a private right of action for fraud is entirely consistent with the underlying purposes of the statute. *Cf. Cannon v. University of Chicago,* 441 U.S. 677, 708 n.42, 99 S.Ct. 1946, 1963, 60 L.Ed.2d 560 (1979) (HEW's enforcement capabilities under Title IX are especially limited in precisely those areas where private suits can be most effective).

■ The fourth element of the *Cort* test, whether an implied private right would infringe on an area of state concern, favors implication of such a right since it is well-established that regulation of the commodities futures industry is essentially a federal concern. *See, e. g., Smith v. Groover,* 468 F.Supp. 105, 115 (N.D.Ill.1979).

Far from evidencing an intent to deny a private right of action, the legislative history of the Act rather plainly, albeit circumstantially, indicates that Congress intended to retain the private right of action which had been judicially implied prior to the 1974 amendments. Congress was fully aware that a private remedy had been implied,

---

7. The court's finding might well have been different had the reparations procedure and the *parens patriae* provisions been a part of the original Act. *See Transamerica Mortgage Advisors, Inc. v. Lewis,* —— U.S. ——, ——, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979). These provisions, however, were not included in the original legislation, and Congress' subsequent inclusion of these remedies without comment demonstrates an intent to *supplement, not limit,* remedies under the Act.

and, more importantly, many members of Congress felt that a private remedy was necessary to enforcement of the Act. This sentiment was reflected in the language of the Act as well as in statements made by numerous legislators in committee and on the floor of Congress. Although the remarks of these legislators cannot be accorded the weight of contemporary legislative history, they are persuasive in determining whether Congress intended to abrogate the private remedy when it amended the Act.[8]

■ For all of the reasons stated above, the court holds that there is a private remedy under the Commodity Exchange Act, as amended, for actions in fraud brought under § 4b, 7 U.S.C. § 6b. This holding does not end our inquiry, however. The court must still determine whether plaintiff can seek relief in the federal court in the first instance, or whether plaintiff can have judicial review of his claim only after he has presented his allegations to the CFTC.

### III

Defendants argue, assuming that an implied private right of action exists, that Congress' creation of a reparations procedure coupled with a plenary grant of disciplinary and regulatory power to the Commission precludes resort to the federal courts in the first instance under the doctrine *expressio unius est exclusio alterius*.[9] In other words, defendants contend that it would be inconsistent to provide for an administrative grievance procedure and for plenary power in the Commission, and not to require aggrieved investors first to seek Commission review of their complaints.[10]

Therefore, defendants conclude, the 1974 amendments appended an exhaustion requirement to the Act: Because plaintiff in the instant case has not presented his allegations to the Commission, it is argued, his claim must be dismissed.

■ As with any case involving the interpretation of a statute, the court must begin with the language of the Act itself. *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 558, 99 S.Ct. 790, 795, 58 L.Ed.2d 808 (1979). Section 14 of the Commodity Futures Trading Commission Act provides that "[a]ny person complaining of this chapter or any rule, regulation, or order . . . may elect to . . . apply to the Commission," and then details the procedures which the Commission is to follow. 7 U.S.C. § 18(a). In explaining this section, the Senate Report states that "[a] complaint could be filed by any person, based on any violation of the Act or the rules, regulations or orders thereunder." S.Rep. No. 93–1131, 93d Cong., 2d Sess. (1974), *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 5843, 5868.

The provision states that an individual injured as a result of violations of the Act "may elect to" pursue his remedy through the reparations procedure. He is not required to so proceed. The plain meaning of the language indicates that he has a choice. When it enacted the 1974 amendments, Congress was well aware that a number of federal courts had implied a private right of action under the Act. If the legislative branch had wanted to append an exhaustion requirement to the Act, it would have done so with language more attuned to that goal.

---

8. Of equal persuasive value is the complete absence, to this court's knowledge, of *any* statements by members of Congress disapproving the judicially implied right of action.

9. The expression of one thing is the exclusion of another. *See Transamerica Mortgage Advisors, Inc. v. Lewis*, —— U.S. ——, ——, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979); *Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412, 419, 95 S.Ct. 1733, 1738, 44 L.Ed.2d 263 (1975).

10. This argument is interrelated with defendants' first contention that no private right of action exists at all. For if the court had found

that no private right could be inferred, plaintiff would have necessarily had to present his claims to the Commission via the reparations procedure in the first instance. The Commission's decision would then be reviewable by an Article III court. 7 U.S.C. § 18(g). The same result would follow if this court were to append an exhaustion requirement to the Act. Thus defendants do not, and cannot, argue that plaintiff could never have his claim heard in federal court. Rather, they argue that plaintiff could never have his claim heard in federal court *in the first instance*.

The legislative history of the 1974 amendments supports this interpretation of the provision. The House version of the Commodity Futures Trading Commission Act, which was reported out of committee, did not expressly recognize a private right of action.[11] Senator Dick Clark, sponsor of one of the three earlier bills which had provided for a private remedy as well as treble damages, warned in testimony before the Senate Committee on Agriculture and Forestry that the cumulative effect of the reparations procedure and the exclusive jurisdiction provision might be inadvertently to repeal the previously recognized jurisdiction of the courts over private damage claims. *See* Hearings on S. 2485, S. 2578, S. 2938 and H.R. 13113 before the Senate Committee on Agriculture and Forestry, 93d Cong., 2d Sess., pt. 1 (1974) at 205.

The Senate Committee subsequently amended the House version of the bill. Following the grant of exclusive jurisdiction, a limiting proviso was added which stated that "[n]othing in this section shall supersede or limit the jurisdiction conferred on the courts of the United States or any State." Section 2(a) of the Commodity Futures Trading Commission Act of 1974, 7 U.S.C. § 2. The meaning of the change was explicitly defined by the Senate Committee: "Federal and State courts retain their jurisdiction." S.Rep. No. 93–1131, 93d Cong., 2d Sess., (1974) at pp. 6, 23, 54, U.S.Code Cong. & Admin.News, p. 5848.

The House and Senate Conference Committee adopted the Senate amendment. 120 Cong.Rec. 34737 (October 9, 1974); 120 Cong.Rec. 34997 (October 10, 1974). In its conference report, the Committee delineated the scope of the Commission's jurisdiction:

The *House* bill provides for exclusive jurisdiction of the Commission over all future transactions. However, it is provided that such exclusive jurisdiction would not supersede or limit the jurisdiction of the Securities and Exchange Commission or other regulatory authorities.

The Senate amendment retains the provision of the House bill but adds three clarifying amendments. The clarifying amendments make clear (a) the Commission's jurisdiction over future markets or other exchanges is exclusive and includes the regulation of commodity accounts, commodity trading agreements, and commodity operations; (b) the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies; and (c) Federal and State courts retain their respective jurisdictions.

H.Conf.Rep. No. 93–1383, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 5843, 5897. Although the Conference Committee adopted the language of the amendment, the Committee explained that the purpose of the amendment "was to make clear that nothing *in the Act* would supersede or limit the jurisdiction presently conferred on the courts of the United States or any State." 120 Cong. Rec.H. 34737 (October 9, 1974); 120 Cong. Rec.S. 34997 (October 10, 1974).

That the 1974 amendments were designed to retain the federal and state courts' jurisdiction in the first instance was further stressed by the chairman of both the House and Senate Committees in reporting the results of the Conference Committee to their respective houses. *See* Remarks of Rep. Poage, 120 Cong.Rec.H. 10248 (October 9, 1974). Remarks of Senator Talmadge, 120 Cong.Rec.S. 18866 (October 10, 1974). Senator Talmadge explicitly noted that "[t]he vesting in the Commission of the authority to have administrative law judges and apply a broad spectrum of civil and criminal penalties is likewise not intended to interfere with the courts in any way." 120 Cong.Rec.S. 30459 (September 9, 1974).

Defendants, relying on *Touche Ross Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), claim that the provision retaining jurisdiction in the federal and state courts creates no cause of action of its

---

11. *See* Hearings on H.R. 13113 before the Senate Committee on Agriculture & Forestry, 93d Cong., 2d Sess. (1974).

own force and effect. The statute in *Touche Ross* by its terms did not grant private rights to members of any identifiable class or proscribe any conduct as unlawful. 442 U.S. at 561, 99 S.Ct. at 2481. Under those facts, it was clear to the court that no private right of action existed. The anti-fraud provisions of the Commodity Exchange Act, at issue here, seek to protect aggrieved investors and proscribe fraudulent practices by contract market members. 7 U.S.C. § 6b. The jurisdictional section is one more piece of evidence that Congress did not intend to deny or delay a right of action to a complaining party.

*Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973) and *Chicago Mercantile Exchange v. Deaktor*, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1974), are cited for the proposition that the doctrine of primary jurisdiction mandates dismissal of plaintiff's claim pending Commission review. The decisions in *Ricci* and *Deaktor* both involved suits against commodity exchanges alleging violations of anti-trust law, the Commodity Exchange Act, and exchange rules. The Supreme Court stayed the district court proceedings pending a Commission determination as to whether exchange rules were, in fact, violated. The Court felt that the Commission would greatly aid the anti-trust court in determining a working relationship between the anti-trust and regulatory schemes. *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 307, 93 S.Ct. 573, 583, 34 L.Ed.2d 525 (1973).

This is not an appropriate case to defer to the expertise of the CFTC. An action for fraud does not involve exchange rules which need Commission approval or interpretation or which involve the complex overlap between a regulatory provision and anti-trust law. Rather, it simply addresses the issue whether there was a breach of duty by the commodities broker to the futures investor. This court is competent to determine whether defendants breached this duty, and, if so, whether that breach was the proximate cause of plaintiff's damages, if any. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47

L.Ed.2d 668 (1976); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Goldman*, 593 F.2d 129 (8th Cir. 1979); *Master Commodities, Inc. v. Texas Cattle Management Co.*, 586 F.2d 1352 (10th Cir. 1978); *Shull v. Dain, Kalman & Quail, Inc.*, 561 F.2d 152, 155 (8th Cir. 1977), *cert. denied* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792.

Finally, the CFTC, created to administer and enforce the Act, has consistently construed the legislation and its amendments as creating a private right of action for complaints of fraud. While recognizing its jurisdictional primacy over "significant issue(s) of regulatory policy," the Commission has deemed it inappropriate for a court to defer an action in fraud to the regulatory body under the doctrine of primary jurisdiction:

> Private litigation seeking damages for alleged violations of provisions of the Act will rarely, if ever, involve issues appropriate for review by the Commission under the doctrine of primary jurisdiction. The judicial resolution of a private fraud action, for example, requires only the application of specific statutory standards to the particular conduct alleged. The issues raised by a particular fraudulent scheme, however complicated, are entirely within the conventional utility of the courts to resolve and should therefore not occasion referral to the Commission.

"Statement of the Commodity Futures Trading Commission Concerning Referrals of Private Litigation Under the Doctrine of Primary Jurisdiction," 41 Fed.Reg. 18472 (May 4, 1976). The Commission has also construed the "may elect" language of the reparations procedure as plainly allowing a complaining individual to pursue reparations or to seek relief in a court of law. 41 Fed.Reg. 18471 n. 5 (May 4, 1976); 41 Fed. Reg. 3993, 3994 (January 27, 1976); 40 Fed. Reg. 55667 n. 10 (December 1, 1975). Noting the court decisions preceding the 1974 amendments, the regulatory body emphasized that "private actions are to be sure, a necessary supplement to the Commission's enforcement activities." 41 Fed.Reg. 37597, 37598 (September 7, 1976).

█ "[T]he consistent construction of a statute 'by an agency charged with its enforcement is entitled to great deference by the courts,'" *United States v. Consumer Life Insurance Company*, 430 U.S. 725, 751–752, 97 S.Ct. 1440, 1454, 52 L.Ed.2d 4 (1977), especially "when it involves a contemporaneous construction of the Act by the officials charged with setting its machinery in motion . . . ." *Chemehuevi Tribe of Indians v. Federal Power Comm'n.*, 420 U.S. 395, 409–410, 95 S.Ct. 1066, 1075, 43 L.Ed.2d 279 (1975). The stance of the Commission, therefore, is persuasive authority for the court's holding that plaintiff need not exhaust his claims before the CFTC.[12]

The results of the exhaustive "sunset" review of the CFTC, conducted by Congress in 1978, are consistent with the court's holding. Pursuant to that review, Congress reauthorized the Commission for another four years. It also modified the reparations procedures and added one provision to the regulatory scheme.

One amendment sought to ease the backlog of reparations claims that had developed due to the number of claims filed with the Commission and the inadequate resources at that body's disposal. *See* "Regulation of the Commodity Futures Market—What Needs to be Done?." U.S.Gen. Accounting Office Doc. No. CED–78–110 (May 17, 1978). Congress amended the reparations procedure by raising the minimum amount necessary to receive a full oral hearing on the claim as a matter of right. 7 U.S.C. § 18(c). During the floor debates, the sponsor of the amendment, Senator Walter D. Huddleston, acknowledged the choice of remedies available to a complaining investor:

> Thus, an aggrieved commodity customer will be able to obtain more expeditious treatment of his claim should the customer elect to pursue his claim in reparations rather than proceed to arbitration or pursue in court the private right of action

which has been judicially implied for violations of certain provisions of the Commodity Exchange Act, or which in the future courts may recognize for other provisions of the Act.

124 Cong.Rec.S. 10537 (July 12, 1978). In describing the reasons causing the backlog of reparations claims, Senator Huddleston criticized lower federal court decisions, such as *Bartels v. International Commodities Corp.*, 435 F.Supp. 865, 870 (D.Conn.1977) upon which defendants rely, as taking the "unfortunate position that Congress intended reparations to be the exclusive forum for adjudicating commodity customer claims." 124 Cong.Rec.S. 10537 (July 12, 1978).

█ The Act was further amended to include a *parens patriae* remedy. 7 U.S.C. § 13a–2. Under this remedy, the Attorney General of any state may institute suit in law or equity in a federal court to protect the interests of residents of that state when he believes that there has been a violation of the Act or the rules promulgated thereunder. Clearly, the state Attorney General is not required to exhaust his remedies before the Commission. In effect, Congress has declared that the rationale underlying the doctrine of primary jurisdiction, the need to defer to the expertise of an administrative agency, is inapplicable with respect to suits initiated pursuant to the *parens patriae* provisions of the Act. Because there is little, if any, substantive difference between suits brought by state Attorney Generals and suits brought by private investors pursuant to an implied right of action, it would be nonsensical to append an exhaustion requirement to the Act for one type of plaintiff and to allow direct access to federal court for another. Therefore, in the absence of a clear congressional directive to the contrary, this court will not imply an exhaustion requirement for those plaintiffs who file suit in federal court pursuant to an implied private right of action in fraud.[13]

---

12. This court also finds it persuasive that Congress knew of the Commission's stance, yet reauthorized the Commission without revision of its basic powers. *See* discussion *infra*.

13. The most recent Supreme Court decision on implied rights of action, *Transamerica Mortgage Advisors, Inc. v. Lewis*, —— U.S. ——, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), is not disposi-

## IV

For all of the above mentioned reasons, the court denies defendants' motion for judgment on the pleadings.

tive of the issues presented in this case. In a split opinion, the *Transamerica* court found that § 206 of the Investment Advisors Act, 15 U.S.C. § 80b–6, did not create a private right of action for money damages on behalf of the clients of investment advisors. The court determined that legislative intent argued against implication of a private remedy, since in companion legislation Congress specifically authorized private actions in prescribed circumstances: " 'Obviously, then, when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly.' " —— U.S. at ——, 100 S.Ct. at 247 (citations omitted). Moreover, the court found that other provisions of the Investment Advisors Act of 1940, 15 U.S.C. § 80b–1 *et seq.*, provided for the enforcement of § 206, and it was "highly im-

probable that 'Congress absent-mindedly forgot to mention an intended private action.' " —— U.S. at ——, 100 S.Ct. at 247 (citations omitted).

Unlike the Investment Advisor's Act, the Commodity Exchange Act has no companion legislation that contains an explicit grant of a private remedy to complaining investors. More importantly, as noted throughout this opinion, Congress has not been silent with respect to an implied right of action for violations of § 4b. The legislative history of the Act indicates that Congress realized that a private right had been recognized and chose not to abrogate that right. Thus, the most important factor of the *Cort* analysis, legislative intent, compels a result in this case different from that reached in *Transamerica*.